[No. S159524. Mar. 30, 2009.]

In re NOLAN W., a Minor, on Habeas Corpus.

### COUNSEL

Kathleen Murphy Mallinger, under appointment by the Supreme Court, for Petitioner Kayla W.

John J. Sansone, County Counsel, John E. Philips, Chief Deputy County Counsel, Gary C. Seiser and Lisa M. Maldonado, Deputy County Counsel, for Respondent San Diego County Health and Human Services Agency.

Douglas B. Marlowe, Carson L. Fox, Jr.; Charles A. Murray; Law Office of William E. O'Nell and William E. O'Nell for National Association of Drug Court Professionals and California Association of Drug Court Professionals as Amici Curiae on behalf of Respondent San Diego County Health and Human Services Agency.

Julie E. Braden, under appointment by the Supreme Court, for Minor Nolan W.

### OPINION

**CORRIGAN, J.**—In an effort to address the intractable problem of parental drug abuse in juvenile dependency cases, the San Diego County Superior Court implemented an aggressive treatment program known as the Substance Abuse Recovery Management System (SARMS). A parent who is believed to have "alcohol and/or drug issues" will be assessed and, if necessary, ordered to participate in SARMS as part of a family reunification case plan. (Super. Ct. San Diego County, Local Rules, rule 6.1.19; hereafter Rule 6.1.19.) The San Diego court enforces parental compliance with SARMS using not just the carrot of reunification, but also the stick of compulsory jail time. For every incident of noncompliance with SARMS, an offending parent may be cited for contempt and incarcerated for up to five days. (Rule 6.1.19.) The "stick" proved to be quite large in this case, in which a mother was sentenced to 300 days in custody for failing to enter drug treatment.

The Court of Appeal found, and all parties agree, that this lengthy jail sentence was an abuse of the juvenile court's discretion. However, in

reaching this decision, the Court of Appeal declined to resolve whether a court may, under some circumstances, enforce its reunification orders through contempt proceedings and incarceration. We granted the mother's petition for review limited to the following issues: (1) Did the court have authority to require the minor's mother to participate in a substance abuse program as part of her reunification plan? (2) Did Welfare and Institutions Code section 213[1] authorize the court to hold her in contempt and incarcerate her for failing to comply with that component of the plan?

The first question is not controversial. Both sides agree, and we conclude, that a juvenile court has the power to order a parent to participate in substance abuse treatment as part of a reunification plan. As to the second question, we conclude contempt sanctions may not be used as punishment solely because the parent failed to satisfy a reunification condition.

The court certainly has broad statutory authority and inherent power to enforce its orders using contempt sanctions. However, the juvenile court's intervention to protect a child from abuse or neglect is regulated by an explicit statutory scheme. If the court determines that a child is at risk, it is authorized to remove the child from parental custody and ultimately to terminate parental rights. In order to regain custody, a parent must demonstrate, generally through compliance with a reunification plan, that a return to parental care is in the child's best interest. It is well settled, however, that reunification services are voluntary, and an unwilling parent may not be compelled to participate. The statutory scheme contains a specific remedy for parental shortcomings during reunification. The statutes consistently provide that a parent's failure to participate in services is evidence that a return to parental custody would be detrimental to the child. (§§ 361.5, subd. (a), 366.21, subds. (e), (f), 366.22, subd. (a).) If the problem is left uncorrected, these findings will ultimately lead to a permanent loss of custody and parental rights. Real party in interest suggests the availability of brief periods of incarceration for contempt would be beneficial, before a court imposes the ultimate sanction of parental rights termination. While that argument can be made, there is no indication that the Legislature intended parents to be punished in this manner. Moreover, as the facts of this case demonstrate, allowing juvenile courts to incarcerate parents for failing to comply with reunification orders is problematic because there are no statutory principles to guide or constrain the court. Accordingly, given the unique nature of reunification orders, we conclude that the juvenile court may not use its contempt power to incarcerate a parent solely for the failure to satisfy aspects of a voluntary reunification case plan.

---

[1] All statutory references are to the Welfare and Institutions Code unless otherwise specified.

## BACKGROUND

The relevant facts are not disputed. On the day of his birth, both Nolan W. and his mother, Kayla W. (Mother), tested positive for amphetamines. Mother admitted using drugs and alcohol during pregnancy and agreed she needed residential treatment. Mother had not been in contact with the child's father and did not know how to reach him.

The San Diego County Health and Human Services Agency (Agency) filed a juvenile dependency petition alleging that because of her drug use Mother had failed to protect her child. (§ 300, subd. (b).) Mother submitted the case on the social worker's report. The juvenile court found the allegations true and placed the minor with a maternal aunt. When Mother agreed to participate in a reunification plan, the court ordered her to enroll in the SARMS program. The court specifically advised Mother that if she failed to follow the program's rules she could be held in contempt of court and sentenced to five days in jail for each violation. Mother acknowledged receiving a copy of the order referring her to SARMS.

When Mother enrolled in SARMS on July 31, 2006, she tested positive for methamphetamine. As part of SARMS, she was directed to attend sessions at a recovery center five days a week. During the next month, Mother frequently missed recovery sessions, failed to stay in contact with SARMS, and did not submit to drug testing. When Mother also failed to appear in court for her first SARMS review hearing, the court issued a bench warrant for her arrest. Mother remained out of contact with SARMS, and on October 18, 2006, the court removed her from the program.

On December 4, 2006, Mother appeared in court for a hearing on a section 387 petition to change the minor's placement. After Mother admitted her SARMS violations, the court found her in contempt on 60 counts of noncompliance with the court-ordered SARMS participation.[2] The court entered a contempt judgment and sentenced Mother to five days for each violation, for a total of 300 days in custody. However, it stayed imposition of judgment on the condition that Mother enroll in and complete a residential drug treatment program. Mother failed to do so and failed to appear at a contested six-month review hearing. Based on the Agency's report, the court terminated reunification services and set the matter for a permanency planning hearing. (§ 366.26.) The court also issued a warrant for Mother's arrest for her failure to appear.

---

[2] When Mother's counsel asked what this number was based on, the court gave this explanation: "Sixty counts on basically [she had] never gone in other than her first time when she was ordered to do six visits [sic] per week, test once a week, and see her SARMS counselor. For all of those weeks it's basically 15 counts for a two-week period."

Two weeks later, following her arrest, Mother was returned to court. Nolan's counsel joined Mother's attorney in arguing that Mother should not be punished for failing to complete services, because services had been terminated and there was a great likelihood Mother would lose parental rights at the upcoming section 366.26 hearing. Nonetheless, because Mother "broke her promise" to enter treatment, the court lifted the stay of the contempt judgment and sentenced Mother to 300 days in custody. She was later released after serving 32 days. Although the juvenile court had initially intended to keep Mother jailed until she had served 25 percent of the sentence (75 days), it was persuaded to release her when all counsel, including counsel for the Agency, argued Mother's continued confinement was pointless because reunification services had been terminated. The court expressed frustration with parents who break their "agreements" and voiced an intent to impose future contempt sentences immediately for instances of noncompliance.

Mother attempted to appeal from the contempt order. The appellate court held that the exclusive means of challenging such an order is by a petition for extraordinary writ relief. Rather than dismissing the appeal, however, the court exercised its discretion to treat it as a writ petition. The court also concluded Mother's claims were not moot because the juvenile court had not vacated its original order and the dependency proceedings had not reached finality. The court declined to reach the merits of Mother's argument that the juvenile court lacked the authority to issue the contempt order. Even assuming the trial court had such authority, the Court of Appeal observed the 300-day sentence, imposed after reunification services had been terminated, was a clear abuse of discretion.

██ We conclude the juvenile court does have authority to order parental participation in substance abuse treatment as part of a reunification plan, but section 213 does not permit the court to punish a parent for contempt solely on the basis that the parent has failed to comply with the court-ordered treatment.

## DISCUSSION

### I. The SARMS Program

The Juvenile Court of San Diego County implemented SARMS in April 1998.[3] SARMS is an intensive case management program operated by

---

[3] Upon the Agency's unopposed request, we take judicial notice of reports prepared by the San Diego County Juvenile Court concerning implementation and review of SARMS. The Agency has also asked us to take judicial notice of documents relating to the Sacramento County Dependency Drug Court program, as well as two unpublished court decisions that refer

contract with an independent provider[4] that specializes in managing drug and alcohol cases. (See Milliken & Rippel, *Effective Management of Parental Substance Abuse in Dependency Cases* (2004) 5 J. Center for Families, Children & Cts. 95, 99 (hereafter Milliken & Rippel).)

If a social worker notifies the juvenile court that the parent of a minor child may have a substance abuse problem, the court refers the parent to SARMS for an assessment. (Rule 6.1.19.) If the parent has not voluntarily submitted to a SARMS assessment by the time the court assumes jurisdiction over the minor, "the court will order [the] parent to report to SARMS for assessment within 48 hours." (*Ibid.*) The San Diego court thus requires a SARMS assessment in all dependency cases when the potential for parental substance abuse exists. If the assessment indicates a need for treatment, a SARMS caseworker prepares a recovery services plan, which is made part of the parent's reunification case plan. The SARMS plan typically includes counseling, therapy, education and support groups, as well as frequent random drug and alcohol tests. Every two weeks, SARMS reports to the court on the parent's compliance and the results of drug tests. Every 30 days, the court holds a hearing to review the parent's progress in treatment. (Milliken & Rippel, *supra*, 5 J. Center for Families, Children & Cts. at p. 99.)

Once participation in SARMS is made part of a parent's reunification case plan, the parent cannot withdraw from the program without suffering consequences. Any noncompliance with the SARMS recovery plan, including missed or failed drug tests or missed meetings, results in a cascade of judicial sanctions made mandatory by a local court rule. Rule 6.1.19 states that every " 'noncompliant event' " "will result in the following sanctions: For the first violation, the parent will receive a judicial reprimand. For each subsequent violation, the parent will be cited for contempt of court for disobeying a court order; a finding of contempt may result in a fine and/or incarceration for up to five days." After a parent has been jailed for contempt, he or she is referred to the county's dependency drug court. (*Ibid.*) The dependency drug court supervises a nine-month program involving even more judicial oversight. (Milliken & Rippel, *supra*, 5 J. Center for Families, Children & Cts. at p. 99.) As with SARMS noncompliance, a parent's failure to comply with drug court orders results in sanctions of increasing severity, including up to five days in custody for each noncompliant event. (*Ibid.*) Repeated failures to comply with drug

---

to dependency drug courts in Tuolumne and Del Norte Counties. Although they may be affected by our ruling, the propriety of other counties' programs is not before us, and their existence is not relevant to the resolution of any legal issue presented here. We decline to take judicial notice of these materials.

[4] The provider in this case is Mental Health Systems, Inc. To avoid confusion, we use the term "SARMS" to denote both the county Agency that administers SARMS and the case management program itself.

court orders may result in the parent's termination from drug court and the scheduling of a permanency planning hearing.

## II. *Authority to Order Substance Abuse Treatment in Reunification Plan*

■ The overarching goal of dependency proceedings is to safeguard the welfare of California's children. (*In re Josiah Z.* (2005) 36 Cal.4th 664, 673 [31 Cal.Rptr.3d 472, 115 P.3d 1133].) "Family preservation, with the attendant reunification plan and reunification services, is the first priority when child dependency proceedings are commenced. [Citation.] Reunification services implement 'the law's strong preference for maintaining the family relationships if at all possible.' [Citation.]" (*In re Elizabeth R.* (1995) 35 Cal.App.4th 1774, 1787 [42 Cal.Rptr.2d 200].) Reunification services are typically understood as a benefit provided to parents, because services enable them to demonstrate parental fitness and so regain custody of their dependent children. (See, e.g., *In re Baby Boy H.* (1998) 63 Cal.App.4th 470, 475 [73 Cal.Rptr.2d 793] [explaining reunification "services are a 'benefit' " and rejecting an argument that parents have a constitutional entitlement to services].)

The legislative scheme reflects this reunification goal. With some limited exceptions not relevant here, section 361.5 requires the juvenile court to order child welfare services for both parent and child when a minor is removed from parental custody. Unless an exception applies, "whenever a child is removed from a parent's or guardian's custody, the juvenile court shall order the social worker to provide child welfare services to the child and the child's mother and statutorily presumed father or guardians." (§ 361.5, subd. (a); see *Tonya M. v. Superior Court* (2007) 42 Cal.4th 836, 845 [69 Cal.Rptr.3d 96, 172 P.3d 402] [parent's receipt of services is presumed at the outset of dependency proceedings].) "This requirement implements the law's strong preference for maintaining the family relationship if at all possible. [Citation.]" (*In re Baby Boy H., supra*, 63 Cal.App.4th at p. 474.)

The reunification statute further provides: "When counseling or other treatment services are ordered, the parent or guardian shall be ordered to participate in those services, unless the parent's or guardian's participation is deemed by the court to be inappropriate or potentially detrimental to the child . . . ." (§ 361.5, subd. (a).) In addition, under section 362, subdivision (c): "The juvenile court may direct any and all reasonable orders to the parents or guardians of the child who is the subject of any proceedings under this chapter as the court deems necessary and proper to carry out the provisions of this section . . . . That order may include a direction to participate in a counseling or education program, including, but not limited to, a parent education and parenting program operated by a community

college, school district, or other appropriate agency designated by the court. . . . The program in which a parent or guardian is required to participate shall be designed to eliminate those conditions that led to the court's finding that the child is a person described by Section 300." We have held that this provision authorizes the juvenile court to order that a parent undergo counseling as a condition of visitation even after dependency proceedings have ended. (*In re Chantal S.* (1996) 13 Cal.4th 196, 204 [51 Cal.Rptr.2d 866, 913 P.2d 1075].)

█ Of course, the juvenile court's discretion in fashioning reunification orders is not unfettered. Its orders must be "reasonable" and "designed to eliminate those conditions that led to the court's finding that the child is a person described by Section 300." (§ 362, subd. (c).) "The reunification plan ' "must be appropriate for each family and be based on the unique facts relating to that family." ' [Citation.]" (*In re Christopher H.* (1996) 50 Cal.App.4th 1001, 1006 [57 Cal.Rptr.2d 861].) Thus, in *In re Basilio T.* (1992) 4 Cal.App.4th 155, 172–173 [5 Cal.Rptr.2d 450], the court reversed a dispositional order requiring substance abuse counseling because there was no evidence to suggest either parent had a substance abuse problem. On the other hand, a reunification order requiring submission to random drug and alcohol testing was found to be appropriate in the case of a father who had a history of excessive alcohol and drug use. (*In re Christopher H.*, at pp. 1006–1008; see also *Sara M. v. Superior Court* (2005) 36 Cal.4th 998, 1018 [32 Cal.Rptr.3d 89, 116 P.3d 550] [requirement that mother be free of drugs and alcohol during visitation was reasonable to protect the children's well-being].)

The Legislature has given juvenile courts broad discretion to fashion reunification orders designed to address the problems that have led to a dependency proceeding. Unfortunately, in a great many dependency cases, parental substance abuse is one such problem. The juvenile court has authority to require a parent to submit to substance abuse treatment as part of a reunification plan as long as the treatment is designed to address a problem that prevents the child's safe return to parental custody. It is important to note that a parent may choose to waive reunification services. (§ 361.5, subd. (b)(14).) But when a parent accepts services, and when substance abuse treatment is reasonably related to the minor's welfare, the juvenile court has authority to order the parent to participate. (§§ 361.5, subd. (a), 362.)

Here, no one disputes that the court appropriately ordered substance abuse treatment as part of the reunification plan to which Mother agreed. Mother tested positive for methamphetamine when her son was born, and she admitted that she needed drug treatment. However, the parties interpret this order differently. Whereas Mother views it as a condition of reunification, the

Agency views it as a command that, if disobeyed, may be punished by incarceration. The disagreement thus concerns how a reunification order can be enforced.

### III.  *Use of Contempt Power to Enforce Reunification Orders*

A notable feature of SARMS is its reliance on judicial officers to enforce requirements by imposing increasingly severe sanctions for every " 'noncompliant event.' " (Rule 6.1.19.) The San Diego County Superior Court's form order directing participation in SARMS identifies the following behavior as sanctionable: "failure to timely enroll in the SARMS Program; a positive result from an alcohol/drug test ('dirty test'); failure to appear for a court hearing; failure to appear for an alcohol/drug test ('no show'); diluting or tampering with a urine sample provided to SARMS for an alcohol/drug test; failure to participate in all required SARMS and treatment program activities; failure to attend required counseling sessions; failure to comply with the rules of the SARMS Recovery Services Plan and treatment program; and/or a dishonest statement to the Court." (Form SDSC JUV-131.) The court's local rules explicitly provide for standardized sanctions: "For the first violation, the parent will receive a judicial reprimand. For each subsequent violation, the parent will be cited for contempt of court for disobeying a court order . . . ." (Rule 6.1.19.) Although the rules do not dictate a specific punishment for such contempt findings, a report on the SARMS program prepared by the San Diego County Juvenile Court indicates incarceration is frequently imposed.

### A.  *The Contempt Power*

It is well settled that the court has inherent power to enforce compliance with its lawful orders through contempt. (*Shillitani v. United States* (1966) 384 U.S. 364, 370 [16 L.Ed.2d 622, 86 S.Ct. 1531]; *In re Michael G.* (1988) 44 Cal.3d 283, 288–289 [243 Cal.Rptr. 224, 747 P.2d 1152].) The Legislature has recognized this power of the juvenile court in section 213, which states: "Any willful disobedience or interference with any lawful order of the juvenile court or of a judge or referee thereof constitutes a contempt of court." (See *In re Michael G.*, at p. 289; *In re Ricardo A.* (1995) 32 Cal.App.4th 1190, 1196 [38 Cal.Rptr.2d 586] [concluding, based on *Michael G.*, that juvenile court's inherent contempt power is statutorily implemented by § 213].)

However, not every violation of a court order is subject to punishment as a contempt of court. The court's traditional contempt power rests on " 'the premise that the right of courts to conduct their business in an untrammeled way lies at the foundation of our system of government and that courts necessarily must possess the means of punishing for contempt when conduct

tends directly to prevent the discharge of their functions.' (*Wood* v. *Georgia* (1962) 370 U.S. 375, 383 [8 L.Ed.2d 569, 82 S.Ct. 1364].)" (*In re Michael G., supra,* 44 Cal.3d at p. 288.) Based on this premise, we long ago explained that contempt is an act, committed in or out of the court's presence, "which tends to impede, embarrass or obstruct the court in the discharge of its duties." (*In re Shortridge* (1893) 99 Cal. 526, 532 [34 P. 227].) The contempt power represents "the inherent power of a trial court to exercise a reasonable control over all proceedings connected with the litigation before it, a power which . . . 'should be exercised by the courts in order to insure the orderly administration of justice.' [Citations.]" (*Cooper v. Superior Court* (1961) 55 Cal.2d 291, 301 [10 Cal.Rptr. 842, 359 P.2d 274].) Contempt is generally a summary procedure designed to protect the dignity of the court in the exercise of its jurisdiction. (*In re Buckley* (1973) 10 Cal.3d 237, 247–248 [110 Cal.Rptr. 121, 514 P.2d 1201].)

The court's power to compel compliance with its orders to ensure the orderly administration of justice does not extend to punishing violations of substantive law when such violations do not impair the dignity or functioning of the court. When the Legislature has established a specific penalty for a transgression, courts may not impose a contempt punishment that is inconsistent with the legislative scheme. (Cf. *In re Lynch* (1972) 8 Cal.3d 410, 414 [105 Cal.Rptr. 217, 503 P.2d 921] ["in our tripartite system of government it is the function of the legislative branch to define crimes and prescribe punishments, and . . . such questions are in the first instance for the judgment of the Legislature alone"].) Violations of substantive law, whether criminal or otherwise, must be adjudicated and punished in accordance with the Legislature's directives. As explained below (*post,* at pp. 1233–1236), the legislative scheme involved here contemplates that the ultimate penalty for a parent's failure to satisfy reunification plan requirements is the loss of parental rights.

### B. *Relevant Case Law*

■ We previously addressed the juvenile court's contempt power in the context of delinquency proceedings. In *In re Michael G., supra,* 44 Cal.3d at pages 287 to 288, a minor who had been made a ward of the court under section 601, subdivision (b), was ordered to attend school regularly as a condition of his probation. After learning that the minor had several unexcused absences, the juvenile court held a hearing, found the minor in contempt for willful disobedience of the order to attend school, and ordered the minor confined for 48 hours in the custody of the probation department. (*In re Michael G.,* at p. 288.) Although we upheld this exercise of contempt power (*id.* at pp. 294–295), the juvenile court's authority over a delinquent ward is quite different from its authority over the parent of a dependent child. When a juvenile delinquency petition is sustained, the court assumes jurisdiction over the minor and has the power to issue orders controlling the minor's

conduct. (§§ 601, 602, subd. (a).) Likewise, in dependency proceedings, the juvenile court's jurisdiction is over the *minor*: It is the abused or neglected minor who becomes a ward of the court, not the deficient parent. (§§ 300, 302.) The juvenile court's authority to control the behavior of a parent in dependency proceedings is not direct, but rather ancillary to its jurisdiction over the child. When the court orders a parent to participate in certain services, compliance with the order is a condition the court has placed on the parent's reunification with the child. Accordingly, our decision in *Michael G.* is not directly applicable here.[5]

No published decision from a California appellate court has explored the extent of the juvenile court's power to impose contempt sanctions as punishment for a parent's failure to comply with reunification orders. In the cases cited by the Agency, most of the statements about the juvenile court's ability to exercise contempt power are dicta, and none addresses the use of contempt to enforce reunification orders. (See *In re Ashley M.* (2003) 114 Cal.App.4th 1, 10, fn. 5 [7 Cal.Rptr.3d 237] [suggesting contempt could be used to force an unwilling child welfare agency to provide services]; *In re Stacy T.* (1997) 52 Cal.App.4th 1415, 1422, fn. 4 [61 Cal.Rptr.2d 319] [suggesting parent's failure to appear in court constitutes a contempt, not a default]; *In re Nemis M.* (1996) 50 Cal.App.4th 1344, 1352 [58 Cal.Rptr.2d 324] [same]; *In re Tiffany G.* (1994) 29 Cal.App.4th 443, 452 [35 Cal.Rptr.2d 8] [suggesting parent's violation of a confidentiality order could be punished as a contempt].)[6] Nationwide, the Agency has directed us to only one case suggesting the juvenile court may use contempt power to enforce reunification orders, and that decision rests on Louisiana statutes that have no apparent California counterpart. (See *State in Interest of Anderson* (La.Ct.App. 1989) 550 So.2d 192, 194–197 [holding juvenile court may use contempt to enforce

---

[5] Appellate decisions in the delinquency context have long held that the juvenile court cannot use its contempt power to impose punishment beyond the maximum penalty the Legislature has prescribed. (See *In re Francisco S.* (2000) 85 Cal.App.4th 946, 955–958 [102 Cal.Rptr.2d 514] [juvenile court could not order confinement of delinquent ward under § 213 when maximum penalty for his offense was a $250 fine]; *In re Mary D.* (1979) 95 Cal.App.3d 34, 38 [156 Cal.Rptr. 829] [juvenile court could not use criminal contempt (Pen. Code, § 166) to impose confinement time on a § 602 ward for noncriminal conduct that was a violation of probation]; see also *In re Ronald S.* (1977) 69 Cal.App.3d 866, 873–874 [138 Cal.Rptr. 387] [juvenile court may not use criminal contempt sanction to elevate a § 601 ward to a delinquent wardship under § 602]; but see *In re Michael G., supra*, 44 Cal.3d at pp. 294–295 [contempt sanction may be imposed if it does not alter the status of the ward].) Even in *Michael G.*, we remained sensitive to the surrounding legislative scheme. Conscious of the Legislature's intent not to institutionalize section 601 wards, we stressed that courts should exercise caution before ordering such a ward into custody for a contemptuous act, and we imposed specific limitations on the juvenile court's contempt power in an effort to harmonize this potential punishment with legislative intent. (*In re Michael G.*, at pp. 296–300.)

[6] We do not foreclose the possibility that contempt orders may be appropriately issued in dependency proceedings under other circumstances.

orders directing a parent into drug counseling and psychological testing but only after it has adjudicated her a parent " 'in need of supervision' " pursuant to a specific statutory procedure].)

█ The lack of pertinent authority matters because reunification orders are unlike orders in other types of civil cases. When a juvenile court orders a parent to comply with a reunification case plan, it directs the parent to do and refrain from doing many things, often of a highly personal nature. These reunification orders are not limited to controlling the conduct of litigation or the parties' behavior in court. Reunification orders also differ from court orders in criminal cases. Reunification orders may resemble criminal probation orders in the scope of conduct they regulate, but, unlike probationers, parents of dependent children are not subject to the court's jurisdiction because they have been convicted of a crime. Instead, they agree to a reunification plan to avoid losing custody of their children. Further, if a criminal defendant fails to comply with a probation condition, any penalty is imposed following a hearing on the alleged violation, not by a summary contempt proceeding. In the dependency context, the juvenile court intervenes to protect a child, not to punish the parent. (*In re Malinda S.* (1990) 51 Cal.3d 368, 384 [272 Cal.Rptr. 787, 795 P.2d 1244].) The statutory scheme is designed to permit the parent to remedy a deleterious situation and resume parental rights and responsibilities.

### C.   *The Statutory Scheme Governing Reunification*

#### 1.   *Participation Is Voluntary*

█ To the extent reunification orders intrude upon a parent's liberty, the Legislature has determined these intrusions are justified by the need to protect children and enable their safe return to competent parental care whenever possible. However, it is not the court's role to force a parent to participate in services. "It is . . . well established that '[r]eunification services are voluntary, and cannot be forced on an unwilling or indifferent parent. [Citation.]' (*In re Jonathan R.* (1989) 211 Cal.App.3d 1214, 1220 [259 Cal.Rptr. 863].)" (*In re Christina L.* (1992) 3 Cal.App.4th 404, 414 [4 Cal.Rptr.2d 680]; see also *In re Michael S.* (1987) 188 Cal.App.3d 1448, 1463, fn. 5 [234 Cal.Rptr. 84] [there is no "requirement that a social worker take the parent by the hand and escort him or her to and through classes or counseling sessions"].) Section 361.5, subdivision (b)(14) explicitly states that reunification services need not be provided to a parent who wishes to forgo them.[7]

---

[7] For the waiver to be valid, the parent must execute an express waiver of services while represented by counsel, and the court must find the waiver to be knowing and intelligent. (§ 361.5, subd. (b)(14).) These procedural requirements ensure that parents understand the potentially grave consequences of their failure to participate in services. (See *Cynthia C. v.*

This rule makes sense. While reunification is the preferred outcome when it serves the interests of both parent and child, no interest is well served by compelling inadequate parents to shoulder responsibilities they are unwilling to accept or unable to discharge.

Nevertheless, the Agency contends a parent's participation in reunification services becomes mandatory if services are ordered at the dispositional hearing. In other words, according to the Agency, once services are ordered a parent cannot change her mind. She must participate, or risk a contempt order and possible incarceration. The Agency cites no support for this argument beyond the statement in section 361.5, subdivision (a) that, "[w]hen counseling or other treatment services are ordered, the parent . . . *shall be ordered to participate* in those services . . . ." (Italics added.) The Agency contends this requirement that parental participation be "ordered," combined with the court's power to enforce its orders with contempt proceedings (§ 213), indicates the Legislature intended to enable the juvenile court to use contempt sanctions to secure compliance with its reunification orders.

We decline to adopt this novel reading of the statutes. By providing that a parent "shall be ordered to participate" in services, section 361.5, subdivision (a) imposes a duty *on the juvenile court* to order participation as part of the parent's reunification plan unless the court finds such participation would be inappropriate or potentially harmful to the minor. This language in itself does not impose a mandatory duty on the parent to participate in services.

### 2. *Consequences of Failure to Participate*

■ In considering the nature of a parent's obligation to comply with reunification orders, it is important to examine what sanctions or punishment the Legislature has specified for noncompliance. Section 361.5 itself provides that, with respect to a dependent child under age three at the time of detention, the court must inform the parent that "failure . . . to participate regularly in any court-ordered treatment programs or to cooperate or avail himself or herself of services provided as part of the child welfare services case plan may result in a termination of efforts to reunify the family after six months." (§ 361.5, subd. (a).) At the same time, the court must inform parents about section 366.26 and the specific possibility that parental rights may be terminated. (§ 361.5, subd. (a).) These prescribed warnings do not include the

*Superior Court* (1999) 72 Cal.App.4th 1196, 1200–1201 [85 Cal.Rptr.2d 669]; see also *Arlena M. v. Superior Court* (2004) 121 Cal.App.4th 566, 571 [17 Cal.Rptr.3d 321].) Before section 361.5, subdivision (b)(14) was enacted, parents could implicitly waive services by declining to seek custody. (See *In re Terry H.* (1994) 27 Cal.App.4th 1847 [34 Cal.Rptr.2d 271].)

possibility of being held in contempt of court, and punished by fine or incarceration, for failure to participate in services. Indeed, this possibility is not mentioned in *any* of the numerous statutorily required advisements.

■ Given the complexity of the statutory scheme governing dependency, a single provision "cannot properly be understood except in the context of the entire dependency process of which it is part." (*Cynthia D. v. Superior Court* (1993) 5 Cal.4th 242, 253 [19 Cal.Rptr.2d 698, 851 P.2d 1307].) Other dependency statutes indicate the Legislature envisions the punishment for noncompliance with reunification services to be loss of those services and, ultimately, loss of parental rights. For example, at the six-month review hearing, the juvenile court must decide whether return of a dependent child to the parent would be detrimental to the child. Section 366.21, subdivision (e) requires the court, in making this decision, to "consider the efforts or progress, or both, demonstrated by the parent . . . and the extent to which he or she availed himself or herself [of] services provided," and it specifies that "failure of the parent or legal guardian to participate regularly and make substantive progress in court-ordered treatment programs shall be prima facie evidence that return would be detrimental." Likewise, a parent's failure to progress in treatment constitutes evidence of detriment at the 12-month (§ 366.21, subd. (f)) and 18-month (§ 366.22, subd. (a)) review hearings. Additionally, if the child was under age three when removed from custody (or part of a sibling group with a child under age three), a finding at the six-month review hearing that the parent failed "to participate regularly and make substantive progress in a court-ordered treatment plan" can result in the termination of services at that point and scheduling of a section 366.26 permanency planning hearing. (§ 366.21, subd. (e).)

These findings are critical. Once services have been terminated, the juvenile court's focus shifts from family reunification to the child's permanent placement and well-being, and the burden accordingly shifts to the parent to show that a termination of parental rights is not in the child's best interests. (*In re Marilyn H.* (1993) 5 Cal.4th 295, 306–307, 309 [19 Cal.Rptr.2d 544, 851 P.2d 826]; *In re Zachary G.* (1999) 77 Cal.App.4th 799, 808 [92 Cal.Rptr.2d 20].) A parent may regain custody after reunification services have been terminated only by showing that changed circumstances demonstrate a return to parental custody is in the child's best interests. (§ 388; *In re Marilyn H.*, at p. 309; *In re Kimberly F.* (1997) 56 Cal.App.4th 519, 528–529 [65 Cal.Rptr.2d 495].) This burden may be especially difficult to sustain for a parent who failed to continue with substance abuse treatment during the reunification period. (See *In re Kimberly F.*, at p. 531, fn. 9.)

Thus, the dependency statutes repeatedly make clear that the consequence of failure to participate in court-ordered reunification services is the loss of

parental rights. The Agency has not called our attention to a single California statute or judicial decision approving the notion that juvenile courts may force compliance with reunification orders by punishing parental lapses with contempt proceedings and incarceration. Although the Agency suggests the threat of incarceration offers a useful strategy for preventing substance abuse relapses,[8] its reasoning could just as logically be applied to other aspects of a parent's case plan. For example, parents are often ordered to adhere to a certain visitation schedule. Under the Agency's analysis, a parent who misses a visit could be held in contempt of court and fined, or incarcerated. Setting aside the question of whether such a sanction would be excessive, it seems clearly inconsistent with the statutory scheme governing reunification.[9]

### D. *Use of Contempt to Punish Noncompliance with SARMS*

Downplaying the punitive nature of incarceration, the Agency seeks to characterize the sanctions imposed for noncompliance with SARMS as civil contempt. Its argument overlooks the distinctions long recognized between civil and criminal contempt. "Where the primary object of contempt proceedings is to protect the rights of litigants, the proceedings are regarded as civil in character. On the other hand, where the object of the proceedings is to vindicate the dignity or authority of the court, they are regarded as criminal in character even though they arise from, or are ancillary to, a civil action. [Citation.]" (*Morelli v. Superior Court* (1969) 1 Cal.3d 328, 333 [82 Cal.Rptr. 375, 461 P.2d 655].) Civil contempt is a forward-looking remedy imposed to coerce compliance with a lawful order of the court. (*Shillitani v. United States, supra,* 384 U.S. at p. 368.) Civil contemners hold the key to the jail cell in their own pocket, and can secure their release at any time by following the court's order. (*In re Lifschutz* (1970) 2 Cal.3d 415, 439, fn. 27 [85 Cal.Rptr. 829, 467 P.2d 557]; *Morelli*, at p. 332 [basis for civil contempt is "the omission to perform an act which is still within the person's power to perform"]; see Code Civ. Proc., § 1219, subd. (a).) Because the confinement imposed for civil contempt is conditional in nature, based on continuing

---

[8] The Agency describes these contempt orders as " 'therapeutic incarceration' " and asserts: "Sometimes it takes a caring consequence, such as court ordered incarceration, to get the parent's attention in a way that enables the parent to hit their own personal rock bottom and become aware of the need to comply with the court's orders for treatment so reunification with their child can be achieved." However, the Agency has offered no empirical support for the proposition that the threat of parental incarceration encourages higher reunification rates. Even if there were such data, the appropriate body to consider whether to modify the family reunification process by incorporating contempt sanctions and parental incarceration is the Legislature.

[9] We consider here only the purely punitive sanctions of a jail sentence or fine summarily imposed on a finding of contempt. Certainly, if a court concludes that a parent is not complying with reunification services it may extend the scope of services and supervision to secure compliance. For example, it may increase the frequency of reporting or testing, or require additional counseling or therapy.

conduct, the length of incarceration is indefinite, depending "entirely upon the contemnor's continued defiance." (*Shillitani*, at p. 371.) On the other hand, so long as specific procedures are observed to safeguard due process, criminal contempt may be used to punish *past* conduct in violation of a court order. (See Code Civ. Proc., §§ 1209, 1218; see also Cal. Judges Benchguide: Courtroom Control (CJER 2008) Contempt and Sanctions, §§ 3.33–3.49 [describing required procedures for exercise of contempt power].) The object of such proceedings "is to vindicate the dignity or authority of the court." (*Morelli*, at p. 333.)

All parties appear to agree that the contempt order in this case was purely punitive. The juvenile court sentenced Mother to 300 days in custody because she "broke her promise" to enter treatment. Reunification services had already been terminated and Mother had been ejected from the SARMS program. The contempt order here cannot be construed as civil in nature.

The Agency would have us look beyond the facts of this case, however, arguing that the contempt orders typically made to enforce SARMS compliance are civil in nature. The assertion fails. The fact remains that contempt orders in this context are punitive in purpose and effect. After a reprimand for the first violation, the San Diego County court's local rules mandate that the court issue contempt citations for every incidence of a parent's noncompliance with SARMS. (Rule 6.1.19.) Although the court retains discretion to set the particular fine or sentence for each contempt citation (*ibid.*), in all such cases the punishment will be based on the parent's past conduct and imposed for a set period of time. There is nothing a parent who has been incarcerated for a " 'noncompliant event' " (*ibid.*) can do or say to purge the contempt. The mere fact that a contempt order has been made in the course of civil proceedings does not render it a civil contempt. (See *Shillitani v. United States, supra*, 384 U.S. at p. 369 [character and purpose of the contempt order are what determine whether it is civil or criminal].) When a SARMS contempt order is based on completed conduct, and cannot be purged or cured by the parent, the sanctions imposed are criminal in nature. Although SARMS contempt orders might be characterized as efforts to secure future parental compliance with reunification orders, the sanctions have this effect only in the general sense that all punishment can have a deterrent effect. Certainly, if a court finds a tardy litigant in contempt and orders him jailed for a day, the order will encourage the litigant to appear on time for his next hearing. But this deterrence of future tardiness does not render the original contempt order civil in nature. Because it punishes past, rather than ongoing, conduct, the order constitutes a criminal contempt. The same is true here.

The routine imposition of criminal contempt sanctions for noncompliance with SARMS underscores the troubling aspect of injecting punitive

measures into reunification. Dependency proceedings are not designed to prosecute parents. (*In re Malinda S., supra*, 51 Cal.3d at p. 384; *In re Walter E.* (1992) 13 Cal.App.4th 125, 137–138 [17 Cal.Rptr.2d 386].) In a dependency proceeding, the state is empowered to intervene because a parent's inadequacy puts a child at risk. Parents who fail or refuse to meet their parental obligations face the profound loss of a relationship with their child. Parents who break the law are subject to criminal prosecution, but they are also entitled to the panoply of rights and protections provided by the Constitution and statute to those who stand accused of a crime.

### E. *Conclusion*

Rule 6.1.19 of the San Diego County Superior Court Local Rules is disapproved to the extent that it calls for imposition of a fine or jail sentence under the mechanism of contempt solely for the purpose of punishing a parent's failure to comply with a condition of a reunification case plan. We emphasize that our decision here is not intended to strip the juvenile court of its well-established contempt authority to control the proceedings before it and protect the dignity of its exercise of jurisdiction. (*In re Buckley, supra*, 10 Cal.3d at pp. 247–248.) Extreme parental misconduct that jeopardizes the child's safety, such as taking the child without permission or engaging in dangerous acts during visitation, could well justify punishment by contempt because such conduct interferes with the court's exercise of its *own* authority over the dependent child. Our holding in this case is limited to the use of contempt power to punish a parent's failure to satisfy a condition imposed simply to facilitate reunification. We express no opinion on the propriety of contempt sanctions in other circumstances.

## DISPOSITION

The judgment of the Court of Appeal is affirmed.

George, C. J., Kennard, J., Werdegar, J., Chin, J., and Moreno, J., concurred.

**BAXTER, J.,** Concurring and Dissenting.—I agree with the majority insofar as it affirms the Court of Appeal's decision to annul the contempt judgment entered against Kayla W. (Mother) in the juvenile court. However, I do so for reasons invoked not by the majority itself, but by the Court of Appeal, namely, that use of the contempt power under the particular facts of this case constituted a clear abuse of discretion. Mother's noncompliance with the reunification plan led to her ejection from the substance abuse recovery program in which she was ordered to participate, the termination of reunification services which the juvenile court was required to provide and which

Mother never duly waived, and the scheduling of permanency planning proceedings necessary to terminate her parental rights. Once this chain of events occurred, the juvenile court had no discretion to use the sanction of contempt—here, a hefty term of 300 days in jail—purely as *after-the-fact* punishment for failing to follow orders whose sole purpose was the retention of parental rights. As evidenced by the Court of Appeal's opinion, no more needs to be said to resolve this case.

I respectfully disagree with the majority's broader rationale and conclusion that the contempt power is *never* available to enforce lawful orders routinely directed at parents in the course of the reunification process before those services have been terminated. Until today's ruling, it appears juvenile courts had authority to at least sparingly order modest fines and/or brief stints in custody—not to punish past failures to comply with the conditions of reunification—but to encourage wavering parents who have not spurned the statutory process altogether, and who have submitted to the court's jurisdiction, to abide by their continuing duty to undergo substance abuse treatment ordered to help the family reunite. Today's contrary holding, which gives juvenile courts no ability to enforce their orders other than by permanently terminating the rights of such parents, seems at odds with the statutory scheme, which seeks to restore functional families whenever possible. The majority's decision will likely come as a surprise to juvenile courts statewide, whose inherent and statutory powers of enforcement are now diminished, and to the Legislature, whose statute authorizing contempt in dependency cases has now been judicially curtailed. My reasoning is as follows.

The juvenile court is a department of the superior court specially authorized to administer the Arnold-Kennick Juvenile Court Law, including the dependency scheme. (See Welf. & Inst. Code, §§ 200, 245; *In re Ashley M.* (2003) 114 Cal.App.4th 1, 6–7 [7 Cal.Rptr.3d 237].)[1] As relevant here, the juvenile court is required, upon removing a dependent child from parental custody (see §§ 300, 355, 361, subd. (c)), to order that social welfare services be provided to parent and child, and that parents who wish to retain their parental rights participate in those services. (§ 361.5, subd. (a); see *Cynthia D. v. Superior Court* (1993) 5 Cal.4th 242, 247–248 [19 Cal.Rptr.2d 698, 851 P.2d 1307].) Various provisions give the juvenile court power to compel parental participation in this regard unless the parents have made clear, by the means set forth in the statute, that they wish to forgo reunification.

As noted by the majority, such compulsion of a participating parent comes in the form of "orders" designed to eliminate the substance abuse or other

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise stated.

problems that caused the child to be adjudged a dependent of the court and removed from parental custody in the first place. (Maj. opn., *ante*, at pp. 1224, 1229.) Thus, section 362, subdivision (c) contemplates the issuance of "any and all reasonable orders to the parents" of the dependent child as the court "deems necessary and proper" for treatment, counseling, and educational purposes. Another provision, section 245.5, allows the juvenile court to "direct all such orders to the parent [or] parents" that best provide for the care, custody, and support of the children under its jurisdiction.

Of course, reunification services need not be provided to a parent who does not wish to maintain the family unit, and who makes an informed decision to reject them. As noted by the majority, section 361.5, subdivision (b)(14) allows the parent to "waive[]" such services, where the waiver is expressed in writing, executed while the parent is represented by counsel, and accompanied by an advisement of the possible consequences, including the termination of parental rights and placement of the dependent child for adoption. (See maj. opn., *ante*, at pp. 1229, 1233–1234 & fn. 7; see also § 360, subd. (a) [parental decision to forgo reunification may lead to establishment of legal guardianship].) Nothing in the statutory scheme or the majority opinion suggests there are any limits on the time for waiving reunification services and relinquishing the parental role. (See § 361, subd. (b) [parent may "voluntarily relinquish" dependent child to state welfare or county adoption agency "at any time"].) The Legislature has thus ensured that the most deficient and reluctant parents are not forced to undergo or continue reunification against their will.

On the other hand, contrary to what the majority implies, nothing in the statutory scheme purports to limit the manner in which the juvenile court may compel parents who have chosen to accept reunification services to comply with orders directing their participation in the plan, including substance abuse recovery programs. Nor does the majority cite any statute that treats the juvenile court differently from other departments of the superior court with respect to the enforcement of such orders. In fact, the opposite seems to be true.

We have said that the contempt power is inherent in, and necessarily incidental to, the powers conferred on all courts to perform their duties and to maintain order and dignity in the process. (*In re Buckley* (1973) 10 Cal.3d 237, 247–248 [110 Cal.Rptr. 121, 514 P.2d 1201].) Contempt may be used judiciously (see *Furey v. Commission on Judicial Performance* (1987) 43 Cal.3d 1297, 1314 [240 Cal.Rptr. 849, 240 Cal.Rptr. 859, 743 P.2d 919]) to convince someone who has disobeyed a court order, but who is still in a position to comply, that he or she should now "do what he [or she] was ordered to do." (*In re Jackson* (1985) 170 Cal.App.3d 773, 782 [216 Cal.Rptr.

539].) While such power exists "independent" of statute (*In re Michael G.* (1988) 44 Cal.3d 283, 289 [243 Cal.Rptr. 224, 747 P.2d 1152]), the Legislature has seen fit to codify and define it in certain respects. (See, e.g., Code Civ. Proc., § 1209 et seq.)

Critical here is section 213. It states that "[a]ny willful disobedience or interference with any lawful order of the juvenile court or of a judge or referee thereof constitutes a contempt of court." (See Code Civ. Proc., § 1218, subd. (a) [specifying fines not exceeding $1,000 or incarceration not exceeding five days, or both].) Section 213 works in conjunction with the traditional power of the juvenile court to ensure that "any" lawful order is discharged. (See *In re Michael G., supra*, 44 Cal.3d 283, 288–289 & fn. 3.)

The majority insists, however, that the Legislature has *implicitly* deprived the juvenile court of both its inherent and statutory authority to hold parents of dependent children in contempt for violating lawful orders to undergo substance abuse treatment and to participate in other programs that are part of an ongoing reunification plan. The proffered reasoning is unclear and unpersuasive.

On the one hand, the majority acknowledges that juvenile courts may employ contempt where necessary and proper to do so in a wide array of dependency settings. (See maj. opn., *ante*, at pp. 1232–1233 & fn. 6.) Such situations arise where child welfare agencies are unwilling to provide reunification services ordered by the court (*In re Ashley M., supra*, 114 Cal.App.4th 1, 9–10 & fn. 5), or where counsel, through words or acts, impugns the integrity of the court. (See §§ 317–317.6 [appointment of counsel for parent and dependent child]; *In re White* (2004) 121 Cal.App.4th 1453, 1477–1478 [18 Cal.Rptr.3d 444] [examples of contemptuous behavior by counsel].) The majority opinion itself cites additional instances in which the *parent's* failure to follow dependency orders may warrant a contempt finding. (Maj. opn., *ante*, at pp. 1232–1233, citing *In re Nemis M.* (1996) 50 Cal.App.4th 1344, 1351–1352 [58 Cal.Rptr.2d 324] [failure to appear at jurisdictional hearing]; *In re Tiffany G.* (1994) 29 Cal.App.4th 443, 448, 451–452 [35 Cal.Rptr.2d 8] [violation of confidentiality order].) These instances include conduct that jeopardizes the physical safety of the dependent child with whom the parent is attempting to reunify. (Maj. opn., *ante*, at p. 1238.)

On the other hand, the majority insists the juvenile court lacks power to hold a parent in contempt for failing to undergo substance abuse treatment or to participate in other reunification services ordered to ensure that the process will succeed. This, the majority asserts, is because of the "unique" (see maj. opn., *ante*, at p. 1224) and "voluntary" nature of parental participation in reunification plans. (Maj. opn., *ante*, at pp. 1224, 1233.) The majority also

suggests that contempt is inherently punitive, and thus inconsistent with such a permissive scheme. (See maj. opn., *ante*, at pp. 1230–1233.)

I disagree with this reasoning. Once the parent voluntarily decides to accept reunification services, and thereby to submit to the jurisdiction of the juvenile court, he or she has, as a necessary consequence, agreed to submit to all lawful orders of the court. As noted, the statutory scheme sets forth various circumstances under which parents must comply with such orders, and does not explicitly exempt them from the contempt power expressed in section 213. If the parent decides either at the start or in the midst of the process that he or she does not wish to participate, the statutory procedures for opting out of reunification may be invoked at that time. What the parent is not free to do is remain in the system while making a mockery of the court's authority and disobeying its orders without any threat of contempt.

Finally, it seems shortsighted as a policy matter to withhold contempt as a means of enforcing parental compliance with reunification orders. The majority leaves no doubt that, in its view, the *only* sanction (i.e., "punishment") for noncompliance with reunification orders is the "loss of those services and, ultimately, loss of parental rights." (Maj. opn., *ante*, at p. 1235.) Certainly, such a drastic outcome is authorized where, notwithstanding the provision of reunification services as required by statute, the evidence shows, and the court finds, that the parent has failed to participate regularly and/or make substantive progress, and that return of the dependent child to the parent would be detrimental to the child. (See, e.g., §§ 366.21, subds. (e) [six-month review hearing], (f) [12-month permanency hearing], 366.22, subd. (a) [18-month permanency review hearing], 366.26 [hearing terminating parental rights]; see also *Cynthia D. v. Superior Court, supra*, 5 Cal.4th 242, 249–250.)

However, for reasons I have described, I seriously doubt that the Legislature intended the termination of reunification services and parental rights, and permanent removal of the child from parental custody, to be the first, last, and sole resort of the juvenile courts with respect to parents who willfully fail to participate in court-ordered programs. As the majority concedes, safeguarding the child and preserving family relationships are the main goals of the dependency scheme. (Maj. opn., *ante*, at p. 1228.) As in other situations in which parents violate dependency orders, the Legislature has embraced the juvenile court's authority to threaten contempt to emphasize the seriousness of the reunification process and give parents every opportunity and incentive to comply.

At bottom, it seems inconsistent to conclude that the juvenile court has the power to compel a parent to participate in reunification, but that the court's only recourse in the event of parental nonparticipation is to order an end to reunification services and terminate the parent-child relationship. I doubt that is what the Legislature intended.