Filed 11/25/14  C.S. v. Super. Ct. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| C.S., <br><br>     Petitioner, <br><br>     v. <br><br> THE SUPERIOR COURT OF SAN DIEGO COUNTY, <br><br>     Respondent; <br><br> SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, <br><br>     Real Party in Interest. | D066543 <br><br> (San Diego County <br> Super. Ct. No. J518573) |


PROCEEDINGS in mandate after referral to a Welfare and Institutions Code section 366.26 hearing.  Kenneth J. Medel, Judge.  Petition denied; request for stay denied.

Dependency Legal Group of San Diego and John P. McCurley for Petitioner.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel, and Paula J. Roach, Deputy County Counsel, for Real Party in Interest San Diego County Health and Human Services Agency.

Dependency Legal Group of San Diego, Tilisha Martin, Carolyn Levenberg and Eva Wiatrowski for Minors.

C.S. seeks writ review of the juvenile dependency court's order, made at the 12-month review hearing, terminating reunification services and setting a Welfare and Institutions Code[1] section 366.26 hearing for her four children, 13-year-old R.R.J., 12-year-old R.S.J., three-year-old Michael S., Jr. (Michael) and one-year-old M.S..[2] C.S. contends there is not substantial evidence to support the finding she received reasonable reunification services. We deny C.S.'s petition and request for a stay.

## FACTUAL AND PROCEDURAL BACKGROUND

*The San Bernardino County Dependency Case*

R.R.J. was born in 2000. In March 2002 her father (the father) was driving on a freeway with C.S. and 18-month old R.R.J. as passengers. C.S. kicked the father in the back of the head, causing him to lose control of the car. As a result, R.R.J. suffered traumatic brain injury and other severe injuries and developed cerebral palsy. C.S. and the father were criminally charged. In April, a dependency case was opened in San

---

[1]    Further statutory references are to the Welfare and Institutions Code.

[2]    We refer to the children singly by name; in groups of two, three or four we sometimes refer to them as the children.

Bernardino County.  C.S. participated in services including a parenting class, individual counseling and a domestic violence class.  R.S.J. was born in 2002.  The case closed in January 2004.

*The Florida Dependency Case*

In the summer of 2005 in Florida, Michael S., Sr. (Michael Sr.) pushed C.S. while she was nine months pregnant with the children's half-sibling, P.O.[3]  Michael Sr. was arrested for aggravated battery.  In early October C.S. and Michael Sr. violated a domestic violence injunction.  R.S.J. and R.R.J. were taken into protective custody.  Another incident of domestic violence occurred.  C.S. was arrested for domestic battery and obstructing an officer with violence and convicted of those offenses.

In late October 2005 after R.S.J. and R.R.J. had been returned to C.S., C.S. threw nine-year-old R.S.J. outside because he was crying.  R.S.J. suffered a broken elbow and required surgery.  R.S.J. and R.R.J. were removed from the home.  C.S. was convicted of child neglect and cruelty toward a child with great bodily harm.

During a January 2006 psychological evaluation, C.S. lied, refused to accept responsibility for solving her problems and admitted she used a belt to discipline three-year-old R.S.J.  The evaluator believed C.S. "would cause severe physical harm to her children if given the chance" and "reported that[] under no circumstances should a child

_____

[3]    Michael Sr. is the alleged father of Michael and M.S. P.O. is not a subject of this case.  C.S.'s sixth child, who was born just before the 12-month review hearing, is also not a subject of this case.

3

be returned to" C.S. The evaluator later stated C.S. had "made positive changes with regards to her anger and temper control." R.S.J. and R.R.J. were returned to C.S.

In January 2009 there was a substantiated report the children were unsupervised. C.S. was arrested for unrelated probation violations and R.S.J. and R.R.J. were taken into custody.

During the Florida dependency case, C.S. participated in reunification services including a 12-week anger management program, a domestic violence group, three psychological evaluations, a parenting program and individual counseling. C.S. successfully completed her reunification plan and the case closed in October 2009. Michael was born in 2011.

*P.O.'s Dependency Case*
*And The Instant Dependency Case*

In November 2012 seven-year-old P.O. was found to have nonaccidental injuries, including an eye that was bruised and swollen shut, a cut under his eye, numerous scars and marks on his neck and several abrasions on his back, including healing linear marks and a loop-shaped mark. P.O. was taken into protective custody and the San Diego County Health and Human Services Agency (the Agency) opened a dependency case. P.O. was declared a dependent and removed from C.S.'s custody. C.S. was offered services, including child abuse classes. She did not participate in any services.

The day after P.O. was detained, C.S. fled to Mexico with R.R.J., R.S.J. and Michael. C.S. hit R.R.J. with a belt and a hanger and hit R.S.J. with a belt. C.S. and Michael Sr. engaged in domestic violence in R.S.J.'s presence. C.S. did not feed the

4

children.  Michael Sr. physically abused R.R.J. and R.S.J. and C.S. did nothing to stop the abuse.  She had a history of returning to Michael Sr. despite a documented history that she and the children were afraid of him.

In February 2013 R.R.J., R.S.J. and Michael were taken into protective custody in Mexico.  C.S. underwent a psychological evaluation.  The evaluator concluded R.R.J., R.S.J. and Michael should not be returned to C.S. because C.S. "evades responsibility in the physical mistreatment of her children" and "sides with her partner and not her children."  After a few weeks, R.R.J., R.S.J. and Michael were returned to the United States and detained in Polinsky Children's Center.

In March 2013 the Agency filed dependency petitions for 12-year-old R.R.J., 10-year-old R.S.J. and one-year-old Michael.  The petitions alleged Michael Sr. physically abused R.R.J. and R.S.J.  R.R.J. and R.S.J. reported that C.S. was aware of the abuse.  R.R.J. had cerebral palsy and some paralysis in her right side because C.S. had engaged in domestic violence while in a moving vehicle with R.R.J.  C.S. had an open dependency case for physical abuse of P.O. and had not participated in reunification services in that case.

M.S. was born May 2013.  The Agency filed a dependency petition for her with the same allegations as the petitions for R.R.J., R.S.J. and Michael.  M.S. was detained in the hospital then moved to a foster home.  Michael was moved to M.S.'s foster home and R.R.J. and R.S.J. were moved to a different foster home.

In June 2013 the court entered true findings on the petitions and ordered out of home placement for the children and reunification services for C.S.  The court set a six-

5

month review hearing, but later vacated the order setting that hearing and never held a six-month review.

The 12-month review hearing took place in August 2014. The court found the Agency had provided C.S. reasonable services, terminated services and set a section 366.26 hearing.

C.S. petitioned for review of the court's orders. (§ 366.26, subd. (l); Cal. Rules of Court, rule 8.452.) This court issued an order to show cause, the Agency responded and the parties waived oral argument.

DISCUSSION

C.S. contends the Agency "made no effort . . . to provide [her] with referrals for a domestic violence class" and made no reasonable efforts to provide individual therapy.

"To support a finding reasonable services were offered or provided, 'the record should show that the supervising agency identified the problems leading to the loss of custody, offered services designed to remedy those problems, maintained *reasonable* contact with the parents during the course of the service plan, and made *reasonable* efforts to assist the parents in areas where compliance proved difficult . . . ..' [Citation.]" (*Tracy J. v. Superior Court* (2012) 202 Cal.App.4th 1415, 1426.) "The effort must be made to provide reasonable reunification services in spite of difficulties in doing so or the prospects of success." (*Mark N. v. Superior Court* (1998) 60 Cal.App.4th 996, 1011.) " 'It is . . . well established that "[r]eunification services are voluntary, and cannot be forced on an unwilling or indifferent parent. [Citation.]" ' " (*In re Nolan W.* (2009) 45 Cal.4th 1217, 1233, quoting *In re Jonathan R.* (1989) 211 Cal.App.3d 1214, 1220.) There is no

6

"requirement that a social worker take the parent by the hand and escort him or her to and through [services]." (*In re Nolan W.*, *supra*, at p. 1233, quoting *In re Michael S.* (1987) 188 Cal.App.3d 1448, 1463, fn. 5.)  " 'The standard is not whether the services provided were the best that might be provided in an ideal world, but whether the services were reasonable under the circumstances.' "  (*Katie V. v. Superior Court* (2005) 130 Cal.App.4th 586, 598-599, quoting *In re Misako R.* (1991) 2 Cal.App.4th 538, 547.)  In "[determining] whether substantial evidence supports the trial court's [reasonable services] finding, [we review] the evidence in a light most favorable to the prevailing party[,] and [indulge] in all legitimate and reasonable inferences to uphold the court's ruling." (*Katie V. v. Superior Court*, *supra*, at p. 598.)

By the time this case began in March 2013 C.S. had received services for a total of six years in previous cases.  At the beginning of this case, the social worker gave C.S. a referral to a therapist.  C.S. said she did not need services.  She also said she would find her own therapist from a list of approved therapists.  The social worker immediately gave C.S. a list of approved therapists.

The services ordered at the June 2013 jurisdictional and dispositional hearing included individual therapy  and a psychological evaluation.  The evaluator was to determine whether a child abuse group or a domestic violence group was most appropriate for C.S.  During her July 2013 evaluation, C.S. misrepresented the facts of the case, "grossly minimized the domestic violence," "denied ever having been a perpetrator of child abuse" and made other "significant minimization[s]."  She never "verbalized any remorse for the circumstances her children were in [or] any responsibility

7

for [those] circumstances." Psychologist M. Bruce Stubbs diagnosed a personality disorder. He concluded C.S. was "incapable of benefitting from reunification services" and "the prognosis for her to be able to . . . safely parent any child in any time frame is extraordinarily poor." "If it is determined that a reunification plan must be offered," Dr. Stubbs recommended therapy, a 52-week domestic violence class and a 52-week child abuse class. In late July, C.S. began individual therapy with Andra Coulter.

C.S. told the Agency she had not benefitted from the domestic violence group she had previously attended because she already knew the subject matter. Because C.S. said she preferred to attend a physical abuse prevention group, the Agency decided to "prioritize [that group] in terms of the order in which [C.S.] starts her services." The Agency did not "want to overwhelm [C.S.] with too many services." In September, C.S. told the social worker she did not need a child abuse class because she had never physically harmed the children. C.S. said she did not need a domestic violence course because the instant case did not involve domestic violence. Because C.S. said she would not attend a domestic violence class, the Agency did not provide referrals.

In October 2013 the court approved an updated case plan including a 52-week domestic violence group and a child abuse group. C.S. began attending a child abuse group. In November, the court updated the case plan by ordering a second psychological evaluation and giving the social worker discretion to add a domestic violence course and a child abuse course if the social worker deemed those services appropriate.

C.S. delayed in making an appointment for the second psychological evaluation, which finally took place in January 2014. Psychologist Judy Matthews diagnosed a

8

personality disorder. She stated, "Due to [C.S.'s] significant level of defensiveness and inability to accept responsibility for her actions, the failure to benefit from previous services . . . , and her lack of utilization of current services, she is incapable of benefitting from more services." Dr. Matthews concluded "[t]he likelihood of [C.S.] being successful at this time is minimal to none."

Meanwhile, in November 2013 the visitation center refused to supervise further visits because C.S. was hostile and disruptive and intimidated and threatened supervisors. The Agency began supervising visits. In late December 2013 the social worker told C.S. that visits would be moved to Thursdays because of a scheduling conflict.

In January 2014 C.S. told therapist Coulter that their Thursday sessions conflicted with her visits and asked for another time. Coulter offered her only two open times, but C.S. said those times also presented conflicts. In February, Coulter reported that in five and one-half months of therapy, C.S. had "made very little if any progress on her treatment goals" and was unreceptive to guidance. The social worker again gave C.S. a list of approved therapists. C.S. claimed she contacted all six therapists on the list; some did not call her back, some did not have openings and some said they could not work with her. C.S. told the social worker she was having difficulty finding a new therapist and in March, the social worker contacted three therapists. One did not feel safe working with C.S. due to her history of aggression. Another said he had openings, but could not take on a patient with a personality disorder. The third therapist did not return the social worker's call.

9

The social worker was unable to find a therapist who would accept C.S. as a patient in light of her diagnosis, and because the 12-month review hearing had been set and the Agency recommended that services be terminated. The social worker and Coulter tried to find another time for C.S.'s sessions but were unsuccessful. The social worker testified she did not know C.S.'s schedule and it was C.S.'s responsibility to call and find a therapist based on referrals the Agency provided.

In May 2014 C.S. told the Agency she was staying at the San Diego Rescue Mission (the Rescue Mission) which provided mandatory domestic violence classes. C.S. said she was "enrolled in trauma informed therapy through the San Diego Rescue Mission and [was] on the waiting list there for individual therapy." She claimed she had met the goals of individual therapy in the Florida case. The social worker contacted a Rescue Mission case manager and learned domestic violence education was a part of all classes and C.S. was participating in classes and individual therapy. The social worker called the Rescue Mission more than a dozen times to request information regarding C.S.'s participation in domestic violence education and her progress in therapy, but never received that information. In July, C.S. told the social worker that her shelter offered counseling and she had completed some of the programs offered.

Throughout the case, C.S.'s priority was to receive as much visitation as possible, while the Agency's focus was on alleviating the risk the children would suffer further physical abuse. Thus, the most important services were child abuse classes and visitation. Individual therapy was less important. A domestic violence course still less important " because . . . as far as [the Agency] knew[, there was] no recent domestic

10

violence and [C.S.] had completed [domestic violence education] and was not willing to [take another domestic violence course]." Moreover, in November 2013 the court removed domestic violence education from the case plan and gave the social worker discretion to add it if the social worker deemed it appropriate. Under these circumstances, the Agency was justified in not providing a referral to a domestic violence class. As to individual therapy, the social worker had given C.S. all available referrals.

At the time of the 12-month review hearing, C.S. had not made substantial progress in services. She had left the Rescue Mission. She was not in individual therapy. She still denied that she had physically abused the children and denied there was any protective issue. She continued to ask why the case was open and even asked the children that question. During this dependency case, C.S.'s fourth, she continued to participate in services but made no internal changes. The social worker did not know what else could be done to help C.S. make those changes. Any lack of services did not result from any failure of the Agency, but rather resulted from C.S.'s refusal to accept the assistance she was offered and her unwavering insistence there was no protective issue. Substantial evidence supports the court's reasonable services finding.

11

## DISPOSITION

The petition is denied.  The request for stay is denied.


BENKE, Acting P. J.

WE CONCUR:


HALLER, J.


McDONALD, J.