Filed 5/16/22  J.J. v. Superior Court CA2/6

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| J.J.,<br><br>    Petitioner,<br><br>v.<br><br>THE SUPERIOR COURT OF SAN LUIS OBISPO COUNTY,<br><br>    Respondent,<br><br>DEPARTMENT OF SOCIAL SERVICES, COUNTY OF SAN LUIS OBISPO,<br><br>    Real Party in Interest. | 2d Juv. No. B318905<br>(Super. Ct. No. 20JD-00078)<br>(San Luis Obispo County) |

J.J. (father) petitions for extraordinary writ relief after the juvenile court, at a contested 18-month review hearing, terminated reunification services and set this dependency matter for a permanent placement hearing.  (Welf. & Inst. Code, §

366.26.)[1]  Father contends substantial evidence does not support the juvenile court's finding that the San Luis Obispo Department of Social Services (department) provided him reasonable services. We disagree and deny the petition.

FACTS AND PROCEDURAL HISTORY

A.J. was born in October 2017.  In May 2020, when he was 2-years-old, the department removed him from his mother's custody.  She had taken him to the hospital where he tested positive for high levels of amphetamine.  Mother had no explanation as to how A.J. had come into contact with the substance.  However, when a department social worker visited mother's home, various safety hazards were discovered within reach of a small child, including marijuana, a pellet gun, medications, and pipes used to smoke methamphetamine and marijuana.  At the time, father was incarcerated and had very little contact with A.J.  Father and mother's relationship ended when A.J. was about four months old.  A.J. was placed with a non-relative foster family.

The department filed a petition seeking dependency jurisdiction over A.J.  It alleged that he was at substantial risk of harm as a result of (1) the failure or inability of his parent to adequately supervise or protect him, and (2) the willful or negligent failure of his parent to adequately supervise or protect him from the conduct of the custodian with whom the child has been left.  (§ 300, subd. (b)(1).)

_____

[1] All further statutory references are to the Welfare and Institutions Code.

2

*Jurisdiction and Disposition Hearing*

In August 2020, the juvenile court conducted the jurisdiction and disposition hearing. Father, who was present via Zoom after his early release from state prison, submitted on the department's report. The juvenile court sustained the petition and exerted dependency jurisdiction over A.J. It ordered A.J. to remain in the care, custody, and control of the department and ordered reunification services for father. The juvenile court also ordered supervised, in-person visitation for father, one time per month for two hours, with discretion in the department to increase the frequency and duration of visits, including the transition to unsupervised visits. Father was also permitted video chats and phone calls with A.J.

*Three-Month Review Hearing*

At the three-month review hearing, the department reported that father had entered a sober living home. He was doing well with his programs, testing negative for all substances, staying in communication with the department, and providing updates regarding his parole officer. Father's video chats with A.J. were also going well, although the department told him that he needs to be more consistent in his contacts with A.J.

*Six-Month Review Hearing*

By the six-month review hearing in February 2021, father had transitioned out of the sober living home where he had been residing since his release from prison and began living with his mother. The department reported that father was compliant with his case plan and recommended continued family reunification services. Father's counsel requested increased visits, overnights, and a 30-day trial. The juvenile court commended father for his progress and reminded him that "to

3

reunify, it's important to develop a bond" with A.J. in addition to completing his parenting classes and programs. The juvenile court then continued services and set the 12-month permanency hearing.

Meanwhile, the department reported A.J. appeared to be happy, was thriving in school, and had a "strong bond" with his foster family.

*12-Month Review Hearing*

In May 2021, the department filed a status review report for the 12-month hearing and recommended family reunification services be terminated. The department expressed concerns with father's ability to provide "appropriate and adequate care" for A.J. For example, after father exited the sober living environment, his participation and commitment "appeared to diminish rapidly." He did not engage in parent education services or random drug testing and was out of compliance with the conditions of his parole. In March, father's parole agent denied father's travel-pass for in-person visits with A.J. due to father's noncompliance and advised father his travel-pass would only resume again in May if he re-engaged and maintained engagement with the programs and conditions of his parole.

Meanwhile, father continued to participate in twice-weekly video chats with A.J. However, when the department offered to increase father's in-person visits from two hours once a month to two hours twice a month, father was not sure he would be able to do that and "would need to think about it." The department's report concluded "[i]t appears . . . [father] is not making reunification with [A.J.] a priority."

At the 12-month review hearing in July 2021, the department changed its recommendation to extend services after

4

father provided additional evidence of his recent efforts to comply with his case plan. The juvenile court granted father an additional six months of reunification services and set the 18-month review hearing. The juvenile court also ordered increased supervised visitation for father to two times per month for four hours, with discretion to the department to increase visits, lift supervision, begin overnights, and a 30-day trial visit, as appropriate.

*18-Month Review Hearing*

At the 18-month contested review hearing, the department recommended reunification services be terminated and the matter set for a section 366.26 hearing. Social worker Wooster prepared the department's status review report and testified that the department's primary goal in extending father services at the twelve-month review hearing was to increase his visits so that he could have more time to bond with A.J. and demonstrate his parenting skills.

Wooster discussed with father the need for progressive in-person visits to help him better understand A.J.'s needs, which would lead to overnight visits. The department increased father's visitation to unsupervised, twice weekly visits for four hours each.

At first, father agreed to increased visitation but frequently cancelled or declined visits. The department offered father hotel and transportation accommodations at the department's expense. Father declined these offers. He eventually informed the department it was "too hard to drive up for the visits weekly [and] . . . he needed to take some time for himself between work and visits." During the reporting period, father was offered 22 in-person visits, but only attended seven. By the 18-month review hearing, father attended three additional in-person visits.

5

The department's status review report indicated father did not consistently attend A.J.'s appointments or follow up after the visits. Father minimized A.J.'s special needs despite having been evaluated by a behavioral health clinician who determined A.J. required a "high-level of specialized services."

The department was also concerned that father was not prepared to provide A.J. with the level of care and services he needs because, at the time of the report, father had not identified any local services and support necessary to place A.J. in father's care. When the department inquired whether father needed assistance identifying resources, he declined stating he was working on it with his sister. Father also planned to rely on his mother and sister for help with A.J.'s childcare, but the department was concerned that father's mother worked full-time, and his sister had five children of her own to care for, including a newborn baby and a child with special needs.

At the end of the review period, the department concluded it was unable to fully assess father's ability to meet A.J.'s needs or to further progress father's visitation to support reunification because father had not maintained consistent visitation. The department did not believe it would be safe to transition A.J. into father's care because he did not know A.J.'s physical, behavioral, and emotional needs.

Father testified he was in compliance with the requirements of his case plan, had completed his parenting classes, and progressed to unsupervised visits. He also testified that his visits with A.J. were "very important" and acknowledged the department kept "pushing for more visitation," but given the distance he had to drive, it was "impossible." He believed he

6

could "reasonably and consistently" visit A.J. every two weeks for four hours.

Father addressed the department's concern that he "minimized" A.J.'s special needs and conceded this was true at first, but it was only because he did not want to believe it as a first-time parent. He also attributed his disbelief to not being around A.J. enough to notice it himself. Father acknowledged he still had "work to do" to become fully "up to speed" on A.J.'s needs.

*Juvenile Court's Ruling*

After hearing argument and considering the evidence, the juvenile court acknowledged the "positive" things father had accomplished with respect to his case plan. However, the juvenile court expressed concern with father's "limited participation" in A.J.'s medical appointments, Child and Family Team meetings, and behavioral health services. The "primary issue" of concern was father's unwillingness to maintain consistent visitation. While father had a "tough drive" to attend in-person visits, the juvenile court stated, "you were asked, sir, to do that for a limited period of time . . . so that the Department could allow progressive visitation, could allow overnights. But we at this point can only speculate as to that because you didn't have the buy-in that the Court needs to see to establish a parental relationship."

The juvenile court found the department had done a "capable job" of providing reasonable services, by clear and convincing evidence and that father's efforts were "minimal." The juvenile court also found, by a preponderance of the evidence, that the return of A.J. to the custody of father would create a risk of detriment to A.J.'s safety, protection, and emotional well-being.

The juvenile court terminated reunification services and set the matter for a permanency plan hearing.

## DISCUSSION

Father contends insufficient evidence supports the juvenile court's reasonable services finding.  We disagree.

*Standard of Review/Reasonable Services*

As a general rule, when a child is removed from parental custody under the dependency statutes, the juvenile court is required to provide reunification services for the parent and child.  (§ 361.5, subd. (a); *In re M.S.* (2019) 41 Cal.App.5th 568, 590.)  Reunification services are among the "[s]ignificant safeguards" that are built into the dependency scheme and should be tailored to the particular needs of the family.  (*In re Marilyn H.* (1993) 5 Cal.4th 295, 307-308; *In re M.F.* (2019) 32 Cal.App.5th 1, 13.)

At the 18-month review hearing, "the juvenile court may not set a section 366.26 hearing unless it finds by clear and convincing evidence that reasonable services were offered or provided to the parent."  (*In re M.F.*, *supra*, 32 Cal.App.5th at p. 14; § 366.22, subd. (b)(3)(C).)  The court may continue the case for up to six months "only if it finds that there is a substantial probability that the child will be returned to the physical custody of his or parent . . . or that reasonable services have not been provided."  (§ 366.22, subds. (a)(3), (b).)

"Services will be found reasonable if the [d]epartment has 'identified the problems leading to the loss of custody, offered services designed to remedy those problems, maintained reasonable contact with the parents during the course of the service plan, and made reasonable efforts to assist the parents in areas where compliance proved difficult (such as helping to

8

provide transportation).'" (*In re Alvin R.* (2003) 108 Cal.App.4th 962, 972-973.)

We review the juvenile court's reasonable services finding and order terminating reunification services pursuant to the substantial evidence standard. (*J.H. v. Superior Court* (2018) 20 Cal.App.5th 530, 535.) We construe all reasonable inferences and resolve all conflicts in favor of the juvenile court's findings. (*Kevin R. v. Superior Court* (2010) 191 Cal.App.4th 676, 688-689.) "'We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the [juvenile] court.'" (*Id.* at p. 689.) When applying the substantial evidence standard, we keep in mind that clear and convincing evidence was required in the juvenile court. (*In re Alvin R.*, *supra*, 108 Cal.App.4th at p. 971.)

*Reasonable Services Were Offered*

Father contends the department did not provide reasonable services because the visitation schedule proposed by the department, particularly over the last six-month review period, "was not designed to facilitate reunification, but to test him." Father's primary issue with the department's services is the distance he was required to drive for in-person visits and the failure to progress him to overnight visits. According to father, it is "untenable" to require him to drive five hours one way every week for a four-hour visit, or even two four-hour visits over two days. Father claims there was no "safety concern" barring overnight visits because he completed his case plan objectives, maintained his sobriety, and made a "good faith" effort to educate himself about A.J.'s special needs.

First, it was father's counsel who initially requested increased visitation that he now complains is impossible. Second,

9

the department did not believe overnight visits were in the best interest of A.J. at that time because father had not maintained consistent visitation.  Instead, the department's plan was to offer father weekly visits and progress to overnights after it assessed the visits went well and father could safely and adequately parent A.J.

This is reasonable, particularly given that A.J. has trouble with transitions, has attachment issues and sleep issues, including frequent nightmares.  Moreover, father was only present in A.J.'s life for the first four months after his birth and never occupied a parental role.  "To promote reunification, visitation must be as frequent as possible, consistent with the well-being of the child."  (*Tracy J. v. Superior Court* (2012) 202 Cal.App.4th 1415, 1426; § 362.1, subd. (a)(1).)

Father next contends the department's requirement that he set up local services for A.J.'s care was another "test" because there was no indication that father would be able to bring A.J. home.  He claims the burden was on the department to provide him with referrals and evaluations.

But the record indicates the department met with father on six separate occasions and asked if he needed help identifying potential resources for speech therapy and preschool.  Father repeatedly stated he was working on it with his sister and would make the required contacts.  It was not until the week before the 18-month review hearing that father finally contacted any local resources, and even declined a visit with A.J. so that he could make the necessary calls.  Father's last-minute effort to comply with the objectives of his case plan is indicative of his unwillingness or inability to be fully invested in providing for A.J.'s care.

10

Father's lack of investment is also evident in his minimal attendance to A.J.'s appointments, his failure to follow up afterward, and most "alarming" to the department, his dismissal of the behavioral health clinician's concern that A.J. had special needs that required services. Although father testified at the 18-month review hearing that he now believes A.J. does have special needs and is committed to ensuring he receives the appropriate services, the evidence suggests otherwise.

From the outset of the dependency proceedings, the department made consistent efforts to help father reunify with A.J. The department tailored father's visits to occur on his days off, offered to pay for a hotel so father could split up his drive, and offered to pay for a rental car or alternative means of transportation when father had car trouble. Despite these efforts, father frequently cancelled or declined visits. As the juvenile court correctly stated, "consistent visitation" is "one of the primary means to establish a parental relationship . . . so the child has a fundamental basis to . . . know that parent is going to show up." Father did not do that here. (See *In re Nolan W.* (2009) 45 Cal.4th 1217, 1233; *In re E.E.* (2020) 49 Cal.App.5th 195, 209.)

We conclude that substantial evidence supports the juvenile court's finding, by clear and convincing evidence, that the department offered or provided reasonable reunification services to father.

## DISPOSITION

The petition for an extraordinary writ is denied.

11

NOT TO BE PUBLISHED.


YEGAN, J.


We concur:


GILBERT, P. J.


TANGEMAN, J.

Linda D. Hurst, Judge
Superior Court County of San Luis Obispo

_____

Linda L. Currey, for Petitioner.

No appearance for Respondent.

Rita L. Neal, County Counsel, Ann Duggan, Deputy County Counsel, for Real Party in Interest.