Filed 10/23/23  M.P. v. Superior Court CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| M.P. et. al., <br><br> Petitioners, <br><br> v. <br><br> THE SUPERIOR COURT OF MONTEREY COUNTY, <br><br> Respondent; <br><br> MONTEREY COUNTY DEPARTMENT OF SOCIAL & EMPLOYMENT SERVICES, <br><br> Real Party in Interest. | H051039 <br> (Monterey County <br> Super. Ct. No. 21JD000052) |

The Monterey County Department of Social and Employment Services (Department), filed juvenile dependency petitions alleging the failure of the mother, E.C. (Mother), to protect and provide support for her minor children, J.C., D.C., A.C., and H.P. (the children), under Welfare and Institutions Code section 300, subdivision (b).[1] The Department alleged that Mother was homeless, with a chronic history of homelessness, and had a history of drug abuse that impaired her ability to take care of her children.  The Department also alleged that the whereabouts of the children's respective fathers, including H.P.'s father M.P. (Father), as well as their interest in and ability to

_____

[1] Undesignated statutory references are to the Welfare and Institutions Code.

parent the children were unknown under section 300, subdivision (g). The juvenile court ordered that the children be detained and placed in protective custody.

The juvenile court later sustained the allegations of the petitions and granted reunification services to Mother and Father (the parents). Following a contested eighteen-month hearing, the court terminated the parents' family reunification services and scheduled a selection and implementation hearing pursuant to section 366.26 (section 366.26 hearing).

The parents both filed petitions for extraordinary writ to vacate the court's order terminating reunification services. The parents contend that the juvenile court should have extended reunification services from 18 months to 24 months based on their consistent progress with their case plans, which demonstrated a substantial probability that the children could be safely returned to them. Father additionally claims that the court erred in finding the Department had offered or provided reasonable services to him. For the reasons set forth below, we conclude the parents' claims lack merit and deny the writ petitions.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

### A. Petition and Detention (September 2021)

On September 24, 2021, the Department filed four juvenile dependency petitions alleging Mother had failed to supervise or protect her minor children, and that she was unable to provide regular care for the minor due to her mental illness, developmental disability, or substance abuse. (§ 300, subd. (b)(1).) The Department also alleged that the whereabouts of Father, as well as the alleged fathers of J.C., D.C., and A.C., were unknown such that the children had been left without any provision for support. (§ 300, subd. (g).)

The Department alleged that Mother had child welfare history dating back to 2009 from Oklahoma and Kansas, related to Mother's history of drug use and homelessness, and that the children had previously been removed from Mother and placed in foster care

2

before being reunified. The Department also alleged that in June 2017, it opened a Voluntary Family Maintenance case[2] for the family to address Mother's homelessness and drug use issues. The Department provided these services to Mother for a year, but Mother did not meet her case plan or objectives and her participation was minimal.

The Department alleged that on August 16, 2021, it received a referral of general neglect of the children. Mother and the children were residing at the Share Center, a homeless shelter in Salinas, as of August 2021. Mother was observed to be under the influence of drugs, as she appeared drowsy with slurred speech and slow movements. During a routine check-in at the shelter, a search of Mother's bag revealed methamphetamine, cocaine, marijuana, a smoking pipe, a knife, and a taser. Mother was not cited or arrested for possession but placed on a behavioral contract, which included her going to Genesis House for drug treatment. The referral also reported that H.P., Mother's youngest son, had been diagnosed with autism spectrum disorder and was non-verbal, and that the three older children had behavioral issues. The children had been left without parental supervision in the shelter, and H.P. had been observed " 'always wearing a backpack with a leash.' "

On September 14, the Department received another referral alleging physical abuse and general neglect of H.P. by Mother. On that day, H.P. woke up around 2:40 a.m. screaming and crying, and when shelter staff arrived by his bedside, they observed H.P. had been tied to the bed. Mother was not at the shelter and took over an hour to return after shelter staff were able to contact her. Mother did not have any explanation for where she had been. Shelter staff additionally reported that they had previously

---

[2] County welfare department staff may provide family maintenance services for families with a child "who[ ] is in potential danger of abuse, neglect, or exploitation, who are willing to accept services and participate in corrective efforts, and where it is safe for the child to remain in the child's home only with the provision of service." (§ 16506, subd. (b).)

spoken with Mother about tying up H.P. and were unaware she was also doing this at night.

On September 15, the Department spoke with Mother's shelter case coordinator, Britnee Lee, who reported that Mother and the children had been living in the shelter for approximately two months. Lee confirmed that when shelter staff came to assist H.P. the previous night, only the children were in the room and Mother was not present. Lee also stated that while Mother claimed she had just been outside " 'in the trees,' " staff had observed her being dropped off by a blue truck.

Lee indicated that the children were left unsupervised in the shelter frequently, and complaints were made daily about their behavior. Lee opined that Mother's drug abuse was making it difficult for her to take care of the children, particularly H.P. and A.C., who were developmentally challenged. Mother had also been kicked out of other shelters due to similar behavioral problems. Lee stated that Mother was receiving income from IHSS and SDI/SSI for H.P. and A.C. and was scheduled to move into a new home in October, but had not yet paid the landlord the necessary funds to secure housing. Staff additionally reported seeing Father in shelter at times and noted he displayed signs of being under the influence of drugs, including being wide-eyed, drooling, and unable to speak.

The Department also held a meeting with Mother, who indicated that H.P. needed to wear a harness with a leash for safety purposes as he would run into the street without it. Mother denied tying H.P. to the bed but acknowledged that he frequently woke up screaming and crying in the middle of the night due to leg cramps. Mother claimed that she had been taking a shower during the incident on September 14 and denied leaving the children unsupervised at any time. She claimed that she either left the children with Father or a friend or took the children with her if she left the shelter. Mother denied using any drugs and refused to submit to voluntary drug testing.

4

The Department spoke with the oldest child, J.C., who denied that Mother had tied H.P. to the bed. J.C. claimed that Mother had either been in the bathroom taking a shower or in the Share Center's library when H.P. woke up crying on September 14. J.C. also denied that Mother had left the shelter, leaving him or his siblings alone and unsupervised. Mother's younger children, D.C. and A.C., refused to speak to the Department, and H.P. could not speak with the Department due to being non-verbal.

On September 21, 2021, the Department informed Mother that it had scheduled an Emergency Response Child and Family Team meeting for September 22 and encouraged her to attend, but she did not do so.

Initial and contested detention hearings were held on September 27 and 28, 2021. The court found that a prima facie showing had been made with respect to the allegations in the petition and ordered that J.C., D.C., A.C., and H.P. be detained and remain under the Department's care, custody, and control.

### B. Jurisdictional/Dispositional Orders (November 2021)

A jurisdictional and dispositional hearing was scheduled for November 16, 2021. In anticipation of the hearing, the Department's report recommended that the court sustain the amended petitions[3], adjudge J.C., D.C., A.C., and H.P. as dependents of the court, remove them from their parents, and offer reunification services to Mother and Father. The children had been placed in nonrelative resource family approved (RFA) homes in Monterey County, with only D.C. and A.C. being placed together.

Although Mother continued to deny that she had tied H.P. to the bed or left the children unsupervised or unattended, she admitted to using methamphetamine two times a month and smoking marijuana daily. The Department noted that Mother had a number

---

[3] The Department requested that the petitions as to A.C. and H.P. be amended to indicate that their respective fathers' whereabouts were no longer unknown as both of them had been in contact with the Department and expressed an interest in caring for A.C. and H.P.

of strengths, including her recognition that she needed a substance abuse treatment program and her prior ability to remain drug-free, hold employment, and provide for her children.  Mother was also willing to participate in a residential drug treatment program and a parenting program for special needs children.  Mother was visiting the children weekly, and visits were reportedly going well as Mother and the children were happy to see each other.  However, Mother struggled with setting boundaries for the older children, who used profanity, talked about gangs, spoke about wanting to fist fight, and would not listen to her when she softly asked them to not say bad words.  Mother also had difficulty controlling H.P., who became hyper or unmanageable after having any sugary snacks.

The Department was unable to assess Father's strengths at the time, as he had not been available to meet with social workers, but indicated that Father had reached out to the Department directly and expressed an interest in caring for H.P.  Father also had supervised weekly visits with H.P., where he would reportedly fall asleep while H.P. was watching videos on his phone.  During one visit on November 4, Father fell asleep and could not be roused for a long period of time.  Paramedics were ultimately called to awaken him, leading the Department to believe Father was under the influence of drugs at the time.

The Department concluded that the children could not be safely placed with Mother due to her chronic substance abuse problems, which impaired her ability to provide them with a safe and stable home.  Mother also was uninterested in engaging in safety planning due to her non-attendance of the Emergency Response Child and Family Team meeting that had previously been scheduled for September 2021.  The Department believed Mother needed to complete a substance abuse treatment program and demonstrate her ability to provide a safe home for the children in order to successfully reunify with them.  Similarly, the Department concluded that H.P. could not be placed

6

with Father due to the indications that he was actively using drugs and did not have a safe home environment for H.P. to live.

At the uncontested hearing, the juvenile court found the allegations of the amended petition true, declared J.C., D.C., A.C., and H.P. as dependents of the court, and ordered family reunification services to the parents along with visitation in accordance with their case plans. A six-month review hearing was set for May 17, 2022.

### C. Six-Month Review

On May 11, 2022, the Department filed a report in anticipation of the six-month review hearing. The Department indicated that Mother was unemployed as she was working on her sobriety and residing in a sober living environment. Mother had attended most of her scheduled parent meetings and all of her Child and Family Team meetings, and had demonstrated some improvement. However, the Department felt Mother continued to face challenges in mitigating the safety concerns that led to the original detention.

The Department reported that Mother had completed a Family Mental Health Assessment and had been following the recommendations from the assessment to participate in weekly therapy sessions. Mother's therapist reported that Mother was engaged in sessions and willing to talk about the dependency case, and had been able to identify stressors that impacted her ability to function. While Mother was not able to identify how her past trauma contributed to her life today or fully understand her role in the removal of the children from her care, Mother also appeared to be committed to reunification and was willing to work on her goals through therapy. Mother was also participating in parenting education classes and had completed four weeks of the curriculum at the time of the report. While Mother's instructor reported that Mother was argumentative and confrontational during week one of her classes, her behavior had since improved.

At the beginning of the review period, Mother enrolled herself in an inpatient drug treatment program in Salinas and graduated from the program in January 2022. Mother had since transitioned to an outpatient program and was attending weekly individual and group classes, as well as Alcoholic Anonymous (AA) and Narcotics Anonymous (NA) meetings three times a week. Mother also indicated she was working with a sponsor and was currently on step one of a 12-step program. Mother's sponsor stated that Mother had initially been defensive and unwilling to take suggestions but later began to make progress and had maintained her sobriety for six months. Mother also agreed to submit to random hair follicle and urine drug testing; while the follicle test was still pending at the time of the report, her urinalysis tests came back negative for drugs.

Mother attended all her supervised visitation during the review period. However, the Department noted that Mother often spoke with the children about the dependency case and shared information with them that was not age-appropriate. Mother also appeared to be encouraging the children not to use profanity or talk about violence because the " 'Department [was] watching' " as well as promising them they would return to her care by February 2022. Further, Mother appeared to be coaching the children about what to say to their therapists, including telling them to talk about how "traumatized" they were at being separated from her. While the Department provided Mother with feedback about more appropriate ways to speak with the children, Mother had difficulty accepting this feedback and often became defensive or "shut[] down."

The Department reported that while Mother had shown some progress during the review period and demonstrated improvements in her communication with the children during visits, Mother was not consistent and often reverted back to oversharing information or telling the children not to do something because they were being watched.

With respect to Father, the Department noted that he had not been in constant contact during the review period or kept the Department updated on his substance use or

recovery. Father only attended one scheduled parent meeting and did not follow up with the Department to schedule further meetings.

Father regularly attended his supervised visitation every week but often just gave H.P. his phone to play with and did not bring any toys or activities. The Department noted that H.P. was often hyperactive during visitations and would try to climb on furniture or exit the room. Father was also observed falling asleep a number of times during one February visit and was warned that he needed to stay awake, or the visit would end.

It was concluded by the Department that Mother: (1) had not been able to demonstrate that she could meet the children's emotional and developmental needs; (2) was still in the process of identifying her past traumas through mental health services; (3) was still working on her recovery and being able to maintain consistency over a period of time with her recovery treatment; and (4) did not have stable housing. The Department also concluded that Father had not been able to: (1) demonstrate his ability to keep H.P. safe and demonstrate age appropriate parenting; (2) demonstrate an understanding as to how his actions led to H.P.'s removal and what changes he would be willing to make to maintain H.P.'s safety and wellbeing; (3) address his substance abuse problem and demonstrate his ability to stay sober over a period of time; and (4) obtain stable housing. The Department therefore recommended that reunification services be continued for both Mother and Father.

At the hearing on May 17, 2022, the court adopted the recommendations of the Department and continued reunification services for Mother and Father. A twelve-month review hearing was set for November 15, 2022.

### D. Twelve-Month Review

On November 4, 2022, the Department filed a report in anticipation of the twelve-month hearing. The Department indicated that Mother had begun part-time employment as a security guard and continued to reside in a sober living environment. Mother

attended all of her scheduled parent meetings and Child and Family Team meetings and had demonstrated some improvement. However, the Department continued to feel Mother was facing challenges in mitigating the safety concerns of her children and accepting her role in the children's behaviors.

Mother continued to attend weekly therapy sessions and showed positive progress in learning how to build positive communication skills with others and increase her ability to manage and express her anger appropriately. Mother also began using psychiatric medication, which led to a reduction in her verbal outbursts and emotional dysregulation, as well as her having more patience during A.C.'s behavioral outbursts in visitations.

During the review period, Mother graduated from intensive outpatient services with her substance abuse recovery program and was participating in recovery services twice a month. However, Mother expressed frustration that she had not been allowed to move forward from step one in her 12-step program and could not articulate why her sponsor did not feel she was ready to progress to the next step. Mother ultimately found a new sponsor, who she felt would support her more and hold her accountable. Mother continued to attend NA meetings regularly up to six times weekly, submitted to all random drug tests, and completed a relapse prevention plan.

The Department reported that while Mother continued to participate in parent education, she expressed frustration at multiple parent meetings about not understanding what was expected of her. Mother believed the children were safe in her care and that the only issue was the parents' substance abuse issues. However, Mother acknowledged that she needed to learn more about mental and emotional abuse as she was unsure of how she could be inflicting it on her children. The Department also observed that Mother appeared to show improvement in parenting from a softer place and setting appropriate boundaries with the children despite having difficulties.

10

The Department additionally reported that Mother, Father, and J.C. had been seen in the community together outside of their supervised visitations. Mother did not appear to be forthcoming about unapproved visitation by claiming she had no way of contacting J.C. then later reporting that he had been in touch with her. The Department informed Mother and Father that if they wished to have unsupervised contact with J.C., they were required to notify the Department immediately and provide information on where they were going to be and for how long, as well as report to the Department after the meeting what they discussed and if they had any concerns for J.C. As Mother did not provide all the requested information, the Department informed her that she could not have any outside contact with J.C. unless the Department arranged for it.

While Mother had reasonable visitation with the children during the reporting period, the Department observed that she had difficulty managing their needs together; however, she was open to suggestions of changes on how to manage their behavior. Mother had some visitations where she was unable to set boundaries and control the children's behavior but also had a number of positive visitations where the children followed her directions and did not engage in any outburst or negative behavior.

With respect to Father, the Department reported that he had obtained part-time employment and stable housing in a studio apartment in Marina. Father had also been more actively participating in case plan services and regularly attended visitations. During the review period, Father completed inpatient services with a sobriety date of March 17, 2022 and continued to participate in NA meetings and outpatient services. However, as Father had been convicted of possession of a controlled substance in June 2022 and sentenced to serve time in county jail, he had requested that all referrals to parenting education be deferred until he completed his jail time in early November 2022.

Father did not appear to understand the trauma and difficulty that the children were facing due to the parents' choices and believed that with his sobriety, he would be able to care for all the children without difficulty. Father also did not believe H.P. was

11

traumatized from using a backpack leash and felt it was useful to prevent him from running away. However, Father indicated he would benefit from more hands-on support to assist him with his parenting skills.

Father had consistent supervised visitation with H.P., but many visits were spent sitting on the couches, eating snacks, and watching videos. H.P. was also observed playing with the room lights, running around the room, and climbing on top of the dining table. Father additionally claimed he had tried to engage in other activities such as coloring or readings books, but H.P. only wanted to " '[watch] Netflix and chill.' " While the Department suggested Father bring in learning pages or ask the school or H.P.'s caregiver if any activities would be helpful during visitations, Father did not follow up on these suggestions.

The Department concluded that Mother: (1) had not been able to demonstrate that she could meet the children's emotional and developmental needs; (2) was still in the process of identifying her past traumas through mental health services; (3) was still working on her recovery and being able to maintain consistency over a period of time with her recovery treatment; and (4) did not have stable housing. The Department also concluded that Father: (1) had not been able to demonstrate his ability to keep H.P. safe and demonstrate age appropriate parenting; (2) had not been able to demonstrate an understanding as to how his actions led to H.P.'s removal and what changes he would be willing to make to maintain H.P.'s safety and wellbeing; (3) was still working on his recovery and being able to maintain consistency over a period of time with his recovery treatment; and (4) had not participated in any therapeutic or education decisions in relation to H.P.'s emotional and behavioral health. The Department therefore recommended that reunification services be continued for both Mother and Father.

At the hearing on November 15, 2022, the court adopted the recommendations of the Department and continued reunification services for Mother and Father. An eighteen-month review hearing was set for March 21, 2023.

12

*E. Termination of Reunification Services*

*1. Eighteen-Month Report*

In anticipation of the eighteen-month review hearing, the Department recommended termination of family reunification services to both parents. In its status review report filed on March 10, 2023, the Department recommended that the court maintain H.P.'s dependency and out-of-home care, terminate the parents' family reunification services, and set the matter for a selection and implementation hearing in July 2023. As to J.C., D.C., and A.C., the Department recommended that the court maintain their dependency and out-of-home care, terminate Mother's family reunification services, deem the eighteen-month hearing as the selection and implementation hearing, and order long-term foster care as the permanent plan, with a post-permanency hearing to be set for September 2023.

The Department reported that while Mother began new part-time employment as a caregiver in February 2023 and had participated in all case plan services, she continued to face challenges in mitigating safety concerns for the children, providing them with a stable home, and accepting her role in their behaviors. Mother was attending weekly therapy sessions and making progress on building healthy interpersonal boundaries with others, and continued to take psychiatric medication as directed, but was observed during many meetings to have a flat effect with minimal emotional responses to any topics.

Mother continued to reside in a sober living environment but as of January 2023, she did not have funds to pay monthly rent and indicated that she may move in with Father. Mother's contact with her sponsor had also been minimal during the reporting period, but she tested negative on random drug tests and reported that she had maintained sobriety for over a year.

The Department noted that while it had multiple conversations with Mother about setting boundaries for her children, Mother still struggled to follow through with implementing the strategies discussed. For example, after the Department advised

13

Mother of ways to redirect the children while still acknowledging their feelings, Mother made numerous comments to A.C. during a family meeting that did not utilize these tactics. Mother also did not appear to understand the Department's concerns about providing snacks that contained ingredients found to escalate the children's negative behaviors and mood, particularly in A.C.'s case. In addition, Mother was not engaging with the children's schools regarding their academic progress and any difficulties they were having. Lastly, after the Department informed Mother in January 2023 that it would be recommending the termination of services and agreed that she would not discuss this with the children until therapeutic services were in place, Mother proceeded to share this information with the children during a supervised visitation three days later.

As for Father, the Department noted he had retained his previous employment and housing during the review period. However, the Department felt Father continued to face challenges in mitigating the safety concerns for H.P. and the other children, and understanding his role in their behaviors. Father continued to attend NA meetings, completed a relapse prevention plan, and tested negative during random drug tests. However, Father still did not appear to understand the Department's concerns around parenting the children, setting boundaries, or the role he played in the trauma the children faced while in the parents' care.

Mother and Father had reasonable visitation with all four children[4] but continued to display difficulty in managing their needs, particularly when the children were together. Mother also continued to have unsupervised visits with J.C., despite being advised that this was not approved, and did not comply with the rules set in place for informing the Department about such visits, resulting these visits being pulled back. In

---

[4] Father requested visitation with all four children prior to the twelve-month review, but the Department did not believe it was appropriate at the time for a number of reasons, including Father's lack of progress early in the case. The Department subsequently approved Father's visitation with all four children for the eighteen-month review period.

addition, family visitations were reduced from twice a week to once a week due to Mother not being able to manage the children's behavior during visits, including them cursing at each other or antagonizing and hitting A.C. with little to no redirection from either parent. As a result of the behavioral issues, the Department and the parents came up with a number of rules that the parents were required to enforce during visits. While the parents did attempt to set some boundaries and enforce the rules in one December visit, they were not consistent and did not redirect the children's misbehavior in a subsequent visit. The Department also expressed concern that Mother had admitted to a number of individuals that she could not manage all her children and did not know how to meet their emotional needs. Mother also blamed A.C. for her inability to reunify with the children and allowed the other children to make similar statements to A.C.

The Department further noted that Father's parenting style appeared to be very "hands off," where he mostly remained quiet and did not redirect the children if they argued or hit one another. Father also laughed and antagonized the older boys by making jokes and had difficulty directing H.P. firmly, which resulted in H.P. running away from him during visitations.

The Department concluded that Mother: (1) had not been able to demonstrate that she could meet the children's emotional and developmental needs, such as knowing their triggers and how to prevent and respond to them, consistently placing their feelings before her own, and understanding how their past trauma is a direct reason for their current behaviors; (2) was still in the process of identifying her past traumas through mental health services and had not identified how her own trauma affected her ability to impact the children's safety; and (3) did not have stable housing. The Department also concluded that Father had not been able to: (1) demonstrate his ability to keep H.P. safe and demonstrate age appropriate parenting; (2) demonstrate an understanding as to how his actions led to H.P.'s removal and what changes he would be willing to make to maintain H.P.'s safety and wellbeing; and (3) actively participate in or attend any

15

medical, behavioral, or educational meetings or assessments in order to demonstrate his ability to understand and attend to H.P.'s needs. The Department further noted that while Mother and Father had participated in case plan services, they both failed to demonstrate sufficient behavioral change reflecting that they had learned from the services provided. The Department therefore recommended that reunification services be terminated for both Mother and Father.

### 2. *Contested Hearing*

On March 21, 2023, the court held an uncontested eighteen-month review hearing. Mother requested a contested hearing, which the court set for May 2, 2023.

At the hearing on May 2, 2023, both parents testified on their own behalf. Father testified that he had been working at the Elijah Foundation in a transitional position for eight months and had recently begun working at Taco Bell. Father also indicated he had been living in a studio apartment in Marina since August 2022. Father confirmed he had been sober for 32 months, checked in with his sponsor every few weeks, and attended NA meetings three times a week. Father had been attending supervised visits weekly with H.P. but believed he was now ready for unsupervised visits.

Father additionally testified that he was attending parenting classes regularly with no absences, and had learned more about how to properly parent H.P., including "fill[ing] his emotional cup and redirection." Father disagreed with the Department's assessment that he could not keep H.P. safe or demonstrate age-appropriate parenting, and indicated he was there for H.P. both physically and emotionally. Father also believed he had addressed the issues that led to H.P.'s removal, namely, his homelessness and active addiction, and demonstrated that he was now ready to raise and take care of H.P. However, when asked by the court to further explain how he meant to "be there" for H.P. and provide for his emotional, educational, and behavioral needs, Father had difficulty answering the question and ultimately indicated he was "not quite sure" how he would do this.

16

Mother testified that during visitations, she attempted to keep the children occupied by bringing snacks and an activity for them to do together. Mother noted that the children had behavioral issues, but indicated she tried to work with the children by listening to what they were saying, "stay[ing] in the solution" with them, and telling them ways to handle these issues. Mother acknowledged that it was difficult to visit with all four children at once and found it helpful to have individual visits, where she noticed an improvement in their behavior. Mother described her relationship with the children as "very open," where they trusted her with most of their problems, and she tried to support and problem solve with them.

Mother additionally gave herself an "F" grade for her parenting skills at the time of removal, but felt she had improved over time to a "B" grade. Mother indicated she was now (1) more aware of what was going on and how she was acting; (2) clean and sober; (3) able to reflect and take constructive criticism; (4) able to communicate and collaborate with others; and (5) able to carry healthy relationships.

The court also heard briefly from attorney Michael Atteridge, who represented all four children during the proceedings. Mr. Atteridge agreed with the Department's recommendation to terminate services. While Mr. Atteridge noted the parents had done many things to improve since the children were first removed, they had not progressed after the twelve-month hearing to more visits, such as unsupervised or overnight visits. Given that 18 months had passed since the children's initial removal, he did not think it was "warranted" to offer the parents additional services. The Department agreed with Mr. Atteridge's comments and further noted that it had been a total of 20 months since the initial removal.

After hearing argument from all parties, the court issued its ruling at a subsequent hearing on May 16, 2023. The court acknowledged that under *Michael G. v. Superior Court* (2023) 14 Cal.5th 609 (*Michael G.*), it had discretion to consent to new services despite the statutory limits for dependency matters. The court determined that the

17

Department had offered reasonable services to the parents, and the parents' participation in services had allowed them to understand the effect their drug use had on their ability to make decisions, regulate themselves, and parent. However, the court indicated that apart from the parents' housing situation and drug use, one of the main issues that led to the original detention was their inability to control the children's behaviors. The court noted that the children treated their parents with the "utmost disrespect" and were nonresponsive to requests to behave. The court therefore found that the children's behavior in recent visits, particularly when one child continued to curse and kick one of the parents, demonstrated that the children still did not respect the parents or their authority. The court also admonished the parents for not using the children's current caregivers as resources to help them learn appropriate ways to regulate the children's behavior and keep them under control; instead, the parents viewed the caregivers negatively and kept them at a distance.

The court commended the parents for becoming sober and maintaining their sobriety and Father for finding employment and stable housing, and acknowledged that both parents clearly loved the children. However, the court noted that "discipline [was] part and parcel of love," and the children's current behavioral issues were the result of the parents' non-parenting and lack of discipline over a number of years.

The court ultimately found that Mother had not been able to demonstrate an ability to have appropriate, constructive disciplinary conversations with the children and implement clear and immediate boundaries to ensure their safety. The court also noted that Mother had still not found stable housing such that the children would not have suitable housing if returned to her. As for Father, the court found that while he had worked on his case plan, he had still not mitigated or alleviated the causes that led to the removal. The court also found that Father had not been able to demonstrate the following: (1) his ability to keep the children safe; (2) age appropriate parenting; (3)

18

meeting the children's developmental and emotional needs; and (4) implementing structure and clear boundaries to make sure of their safety.

The court ordered that all four children remain dependents and terminated reunification services for both parents. The court set H.P.'s matter for a section 366.26 selection and implementation hearing on August 29, 2023, with a post-permanency review hearing set for November 7, 2023. As for J.C., D.C., and A.C., the court deemed the eighteen-month hearing as the selection and implementation hearing and set a post-permanency review hearing for November 21, 2023.

After making its ruling, the court encouraged the parents to not give up and keep working hard, including working on structure, implementing boundaries, staying sober, finding permanent housing, and understanding their role as a parent to be respected, not a friend. The court noted that once the parents felt they had made sufficient progress towards remediating the issues that led to the initial removal, they could consider filing a petition under section 388 demonstrating changed circumstances.

### F. Petitions for Extraordinary Writ

Father and Mother filed timely notices of intent to file a petition for extraordinary writ on May 17, 2023, and May 18, 2023, respectively. (Cal. Rules of Court, rule 8.450(e)(4)(A).) Within 10 days of the record being filed, Father and Mother timely filed their petitions for extraordinary writ with this court on June 29, 2023, and July 3, 2023, respectively. (Cal. Rules of Court, rule 8.452(c)(1).) Real party in interest Department filed its opposition on July 18, 2023.

## II.    DISCUSSION

### A. Applicable Law and Standard of Review

Under section 300 et seq., "California has a comprehensive statutory scheme establishing procedures for the juvenile court to follow when and after a child is removed from the home for the child's welfare. [Citations.]" (*In re Celine R*. (2003) 31 Cal.4th 45, 52.) " 'The objective of the dependency scheme is to protect abused or neglected

19

children and those at substantial risk thereof and to provide permanent, stable homes if those children cannot be returned home within a prescribed period of time.' " (*In re Marilyn H.* (1993) 5 Cal.4th 295, 307.)

When a dependent child is removed from a parent's custody, section 361.5 of the Welfare and Institutions Code generally requires that parents receive reunification services. (§ 361.5, subd. (a)[5]; see also § 361.5, subd. (a)(1) [describing family reunification services].) The purpose of such reunification services is to " 'eliminate the conditions leading to loss of custody and facilitate reunification of parent and child.' " (*In re I.A.* (2019) 40 Cal.App.5th 19, 23.) Facilitating reunification " 'furthers the goal of preservation of family'" (*ibid.*), which " 'is the first priority when child dependency proceedings are commenced.' " (*In re Nolan W.* (2009) 45 Cal.4th 1217, 1228.) While "the law favors reunification whenever possible…reunification services constitute a benefit; there is no constitutional " ' "entitlement" ' " to those services. [Citation.]" (*In re Aryanna C.* (2005) 132 Cal.App.4th 1234, 1242.)

Reunification services that are ordered generally begin with the dispositional hearing and, for children three years or older, end 12 months thereafter. (§ 361.5, subd. (a)(1)(A).) However, section 361.5, subdivision (a)(3)(A) provides that services may be extended to 18 months "if it can be shown[…] that the permanent plan for the child is that the child will be returned and safely maintained in the home within the extended time period. The court shall extend the time period only if it finds that there is a substantial probability that the child will be returned to the physical custody of the child's parent or guardian within the extended time period or that reasonable services have not been provided to the parent or guardian."

---

[5] This section provides as follows: "[e]xcept as provided in subdivision (b), . . . whenever a child is removed from a parent's or guardian's custody, the juvenile court shall order the social worker to provide child welfare services to the child and the child's mother and statutorily presumed father or guardians."

If the child is not returned to the parent at the eighteen-month review hearing, "the court shall order that a hearing be held pursuant to [s]ection 366.26 in order to determine whether adoption, … tribal customary adoption, guardianship, or continued placement in foster care is the most appropriate plan for the child. … The court shall also order termination of reunification services to the parent or legal guardian. … The court shall determine by clear and convincing evidence whether reasonable services have been offered or provided to the parent or legal guardian." (§ 366.22, subd. (a)(3).) " 'Absent extraordinary circumstances, the 18-month review hearing constitutes a critical juncture at which "the court must return children to their parents and thereby achieve the goal of family preservation or terminate services and proceed to devising a permanent plan for the children." [Citations.]' " (*Bridget A. v. Superior Court* (2007) 148 Cal.App.4th 285, 307-308.)

We review the juvenile court's findings in support of an order terminating reunification services for substantial evidence. (*J.H. v. Superior Court* (2018) 20 Cal.App.5th 530, 535.) "We do not evaluate the credibility of witnesses, reweigh the evidence, or resolve evidentiary conflicts. Rather, we draw all reasonable inferences in support of the findings, consider the record most favorably to the juvenile court's order, and affirm the order if supported by substantial evidence even if other evidence supports a contrary conclusion. [Citation.]" (*In re L.Y.L.* (2002) 101 Cal. App. 4th 942, 947.)(.)

**B. Substantial Evidence Supported the Juvenile Court's Order to Terminate Reunification Services**

Notably, the parents do not claim that there was insufficient evidence to support the court's order to terminate services. Instead, the parents argue that reunification services should have been extended for an additional six months because there was a substantial probability of safely returning the children to them by that time. Mother contends she has been making consistent progress with her case plan, including: (1) attending weekly therapy and learning how to establish healthy boundaries; (2)

21

maintaining her sobriety for over a year and residing in a sober living environment; (3) completing parenting courses that have helped her to be patient and listen to the children; (4) maintaining constant contact with the Department and attending all meetings and visitations; and (5) having a strong support network. Father similarly claims that he has been making steady progress with his case plan, including maintaining his sobriety, obtaining housing and steady employment, maintaining all visits, and being equipped to handle H.P.'s emotional and medical needs. The parents further argue that the court has the discretion to extend reunification services to 24 months under section 366.22 if they meet all the criteria under section 366.21, subdivision (g)(1).[6] As the juvenile court found the parents had made significant progress in their case plans, the parents claim that they have met this criteria and therefore should be entitled to additional services.

We disagree. While section 366.22, subdivision (b) provides for a further extension of services after 18 months, this is only applicable to "three narrowly defined categories of parents who have faced specified obstacles to reunification." (*Michael G., supra,* 14 Cal.5th at p. 628.) Those categories are: (1) a parent making progress in a court-ordered residential substantial abuse treatment program; (2) a parent who is a minor parent or nondependent minor parent at the time of the initial hearing; or (3) a parent recently discharged from incarceration, institutionalization, or custody of the United States Department of Homeland Security Services. (§ 366.22, subd. (b).) Further, our high court has indicated that even if these exceptions apply, an extension is not automatic and additional conditions must first be met. (*Michael G., supra,* 14 Cal.5th at p. 628 [noting that the parent must be making significant and consistent progress in a treatment

---

[6] Under this section, the court may extend services if the parents have "maintained consistent and regular contact and visited the child[ren];…[¶] ..made significant progress in resolving the problems that led to the child[ren]'s removal and;…[¶] demonstrated the capacity and ability to complete the objectives of her treatment programs and provide for the child[ren]'s safety, protection, emotional well-being and special needs." (§ 366.21, subd. (g)(1)(A)-(C).)

program or in establishing a safe home for the child, and the court must find extension of services is in the child's best interest and that there is either a substantial probability of return to the parents at the end of the extension period or reasonable services were not provided].)

None of the exceptions noted in section 366.22, subdivision (b), are applicable in the instant matter. While the parents were previously enrolled in inpatient treatment programs, they have both graduated. Accordingly, the parents fail to demonstrate that they meet the criteria for extending services for an additional six months.

We recognize that under *Michael G.,* the court has the discretion to extend reunification services past the eighteen-month mark under the "escape valve" in section 352, which applies for "exceptional situations in which the court determines that extending services and continuing reunification efforts beyond 18 months is not contrary to the child's interests." (*Michael G., supra,* 14 Cal.5th at pp. 632-634.) Nevertheless, the court in'this matter acknowledged this discretion and ultimately did not find that it was in the best interests of the children to continue further services based on the parents' lack of progress in addressing the children's behavioral issues, one of the primary reasons for the initial removal.

Further, in examining the record in the light most favorable to the juvenile court's order, there was substantial evidence supporting the court's finding that Mother and Father had not made substantive progress in resolving or mitigating the issues that led to the children's removal, namely: (1) meeting the emotional and developmental needs of the children; and (2) controlling or parenting them successfully. With respect to Mother, the record indicates that Mother still did not have stable housing where she could safely live with all four children if they were returned to her care. In addition, the record reflects that despite completing multiple parenting classes and receiving advice from various sources on how to establish appropriate boundaries with the children, Mother chose not to follow this advice repeatedly. While Mother had some positive visitations

23

during the 18 months of services, her progress was inconsistent as she repeatedly struggled with maintaining control over all the children. In particular, we note that the Department documented more improvement in Mother's parenting skills in the twelve-month report than in the eighteen-month report. Such a difference indicates that Mother had not been able to make steady progress in alleviating the Department's concerns about the children's behavior.

The record also reflects that Mother failed to redirect inappropriate conduct, did not intervene when the older children blamed A.C. for the family's inability to reunify, and did not regulate her emotions in front of the children. Another notable example includes Mother informing the children of the Department's decision to terminate services only three days after the Department specifically asked her not to do so. Mother also did not consistently follow the detailed rules that she and the Department worked on to assist her during visits. The record demonstrates that she implemented them in one visit but failed to do so in a subsequent visit.

Turning to Father, his repeated behavior during visits which included falling asleep, letting H.P. watch videos, and not maintaining sufficient control over H.P. – resulting in H.P. running away or becoming hyperactive – reflected that Father had not made improvements in learning to act as an authority figure and to effectively discipline H.P. Further, Father's inability to explain to the court how he intended to "be there" for H.P. demonstrated that he was not fully equipped to address H.P.'s emotional, educational, and behavioral needs.

We additionally note that the children were represented at the hearing and their counsel agreed with the recommendation to terminate services, based on his observation that the parents had never progressed beyond supervised visits since the children's initial removal. Further, at the time of the hearing, a total of 20 months had passed since removal, thus demonstrating that the parents had been given substantial time to resolve or mitigate the issues that resulted in removal, which they failed to do.

24

Mother and Father are certainly to be commended for maintaining sobriety and taking significant steps towards stabilizing their housing and employment issues. Further, as noted by the court in its holding, both parents have the ability to continue working on the issues that resulted in their loss of custody and file section 388 petitions demonstrating changed circumstances. However, the record reflects there was substantial evidence that despite the parents' progress in alleviating their substance abuse, housing, and employment issues, they failed to fully address the parenting and discipline issues that contributed to the children's removal. Accordingly, the court did not err by terminating reunification services and setting the section 366.26 hearing.

### C. *Father Fails to Demonstrate that the Department Did Not Provide or Offer Him Reasonable Services*

Father additionally argues that he did not receive reasonable reunification services because he was required to visit with all four children, as opposed to having one-on-one visits with H.P. Father claims that because these " 'family visits' " did not go well, it was detrimental to his progress and case plan to include the other children in his visitation "requirements."

Father's argument fails for two reasons. First, Father's visits with all four children only began after the twelve-month hearing, thus providing Father with a year of one-on-one visitations with H.P. and sufficient time to demonstrate progress in his case plan, which, as detailed above, he did not do. Second, despite Father's claim that he was somehow required to visit all four children, the record reflects that Father *himself* requested visitation with all four children despite the Department's initial recommendation otherwise. Therefore, we find no merit to Father's contentions.

## III.    DISPOSITION

The petitions for extraordinary writ are denied

_____
Wilson, J.

WE CONCUR:


_____
Greenwood, P.J.


_____
Bamattre-Manoukian, J.


M.P. et al. v. Superior Court
H051039