Filed 12/12/25  M.S. v. Super. Ct. CA1/4

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION FOUR

| | |
|---|---|
| M.S.,<br><br>    Petitioner,<br><br>        v.<br><br>THE SUPERIOR COURT OF THE CITY AND COUNTY OF SAN FRANCISCO,<br><br>    Respondent;<br><br>SAN FRANCISCO HUMAN SERVICES AGENCY et al.,<br><br>    Real Parties in Interest. | A174322<br><br>(San Francisco City & County Super. Ct. No. JD243108) |

M.S., the presumed father of Lilith S. (father), has petitioned this court for writ relief in this Welfare and Institutions Code section 300[1] dependency proceeding.  Father asks that we order the court to reverse its September 2025 orders terminating his reunification services and setting a section 366.26 permanent plan selection and implementation hearing for January 7, 2026 and, further, order that he continue to receive reunification services.

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

1

According to father, the juvenile court prejudicially erred in terminating his reunification services because he had made substantive progress in his court-ordered treatment program, and also erred in reducing his visitation rights after terminating services because doing so impairs his ability to argue that his parental rights should not be terminated under the parent/child beneficial relationship exception. Father also requests that we order that the January 7, 2026 section 366.26 hearing be stayed.

We conclude father's arguments are without merit and deny both his petition and stay request.

## I. BACKGROUND

### A. *The Allegations Against Father and Mother*

In July 2024, the San Francisco Human Services Agency (Agency) filed a juvenile dependency petition regarding Lilith in San Francisco Superior Court under section 300, subdivisions (b) and (j). The Agency alleged Lilith's mother (mother) suffered from substance abuse and mental health issues.

According to the petition, these substance abuse and mental health issues posed substantial risks to Lilith, who, when she was born in July 2024, tested positive for fentanyl, cocaine, and benzodiazepines, and suffered withdrawal symptoms. It was further alleged that mother had previously been unable to reunify with a child, Orion, who was detained upon birth in 2017 as a result of similar substance abuse by mother and removed from her custody.

The Agency also alleged that father, among other things, had a history of substance abuse issues that negatively impacted his ability to care for Lilith, had been arrested for possession of substances, had a history of fentanyl and methamphetamine use, and also had failed to reunify with Orion after his removal in 2017.

2

The Agency further explained the circumstances related to its petition in an initial petition report. It reported that mother and father had been in a relationship for 17 years but did not live together. Mother, then 37 years of age, was a known drug user who admitted to using drugs on the day of Lilith's birth and during her pregnancy, was homeless, and planned to enter a residential treatment program.

Father, then 55 years of age, reported he had a history of using methamphetamine and fentanyl, was last arrested for possession of controlled substances, and had been sober since that time. Father told social workers "he was unaware [Mother] was using fentanyl during [her] pregnancy although he had his suspicions." According to Father, "She was using behind my back. I would ask her, and she denied it." Father supported mother's decision to enter a residential treatment program, and was open to random drug testing and to following the Agency's recommendations.

In an addendum report, the Agency indicated that father had been released from prison in January 2023 after serving a prison term since 2018 for what he said was a "federal level conspiracy drug case." He said he was included in the case because the conspirators reported selling drugs to him. He reported completing a drug treatment program in prison, during which he began his "sobriety journey."

When these proceedings began, father was living as required by federal probation authorities in a "Sober Living Environment," where Lilith could not stay, after he had spent 10 months in a halfway house. He was employed and worked 10 hours a day, six days a week, making it impossible for him to be Lilith's primary caregiver. He claimed to have limited contact with mother during his time in prison and in the halfway house.

3

The court continued the jurisdictional/dispositional hearing a number of times and the Agency filed second and third amended petitions. It alleged in its third amended petition, filed in February 2025, that mother had failed to protect Lilith because she had substance abuse and mental health issues that required further assessment and treatment, which impacted her ability to care for Lilith, and that her parental rights regarding Orion, who had been previously abused, had been terminated. This was accompanied by specific allegations, including that Lilith was in substantial danger because mother had been discharged, for a second time, from a treatment program after an altercation with another resident and program staff, which showed mother's inability to practice impulse control and emotional regulation.

The Agency alleged that father too had failed to protect Lilith because of his own history of substance abuse issues that required assessment and treatment, and which impacted his ability to care for Lilith, and that his parental rights regarding Orion had also been terminated. Its allegations included that father had tested positive for amphetamine in 2018 and admitted at that time to use for recreational purposes.

**B.** *The Juvenile Court's Jurisdictional and Dispositional Rulings*

In February 2025, the juvenile court, upon the parents' submission to the Agency's allegations, found most of them to be true as amended, including those we have summarized above. It ordered that Lilith was a dependent of the court and removed from her parents' custody, and ordered reunification services and supervised visitation rights for mother and father. It advised the parents that the court might terminate reunification services within six months and possibly terminate their parental rights.

4

## C. *The Agency Recommends Termination of Reunification Services*

On July 10, 2025, the Agency filed a status review report in which it recommended the court terminate reunification services for both parents and set a section 366.26 hearing. The Agency reported that mother had not made progress towards reunification; for example, she had been arrested twice in May 2025 and once in June 2025 for possession of drugs and other activities, and had not drug-tested since February 2025. Father, the Agency reported, had moved into permanent housing, attended all his supervised visits with Lilith, complied with drug testing, completed a parenting class, was in weekly therapy, and was engaging in his services through probation. He had missed five drug tests during the Agency's latest reporting period, however, and had tested positive early in his probation the year before.

The Agency stated its "biggest concern" regarding father was his "long history of substance abuse and romantic relationship with [mother] and that he is only participating in services as a condition of his probation, to remain out of jail. . . . Over the years, [father] has remained in a romantic relationship with the mother and more likely than not was aware of her chronic drug use while [mother] was pregnant with Lilith, having knowledge of the risks, medical and health outcomes Lilith would be predisposed," an apparent reference to his awareness of Orion's difficulties at birth in 2017.

## D. *Father Tests Positive for Drugs Four Times in July 2025*

On September 9, 2025, the Agency filed an addendum report stating that father tested positive for fentanyl every week for four consecutive weeks in July 2025, with the amounts of fentanyl and/or Norfentanyl found in his test samples increasing significantly each time. These positive tests occurred on July 2 (fentanyl 0.6 ng/mL, Norfentanyl 8.5 ng/mL), July 9

5

(fentanyl 1.2 ng/mL, Norfentanyl 10.7 ng/mL), July 16 (fentanyl 4.5 ng/mL, Norfentanyl 15.7 ng/mL), and July 23 (positive for fentanyl 3.2 ng/mL and Norfentanyl 29.2 ng/ML).

The Agency further reported that "[w]hen the positive results were discussed with [father], he initially denied any use . . . and adamantly stated it was a false positive test." After he was told there was more than one positive test and that they occurred on days he visited with Lilith (the Agency also believed he was under the influence during those visits), he "stated that he helped mother . . . with moving and cleaning items in her storage and was 'exposed' to fentanyl but could not indicate how he was exposed." The Agency concluded that father's positive tests while knowing he had visits with Lilith and his being under the influence of fentanyl during those visits "does not demonstrate behavioral changes that would keep Lilith safe."

The Agency further reported that mother "had not engaged in services, entered treatment, or drug tested," "missed multiple visits with Lilith," and said she and father were in a "romantic relationship." It maintained its previous recommendation that reunification services be terminated for both parents.

## E. *The Six-Month Review Hearing*

A contested six-month review hearing occurred on September 10, 2025. Father and his counsel attended but not mother, whose attorney said she had not been in contact with her for two months.

The Agency presented the testimony of an Agency protective services supervisor, Mamie Wong. Wong said she was familiar with the case and had prepared the Agency's addendum report for the hearing. She continued to recommend that the court terminate the parents' reunification services and schedule a section 366.26 hearing.

6

Wong said she had a July 29, 2025 meeting with father regarding his four positive drug tests in July 2025. According to Wong, he "initially denied, adamantly denied and then stated that the mother had stayed at his place. And then he . . . helped mother move some items from her storage unit and was somehow exposed." He also alluded to his negative tests with probation. Wong described father as "evasive" and said he contradicted himself regarding his contact with mother because he initially said he was not in touch with her.

Wong further testified that she asked an administrator at the lab responsible for processing the drug tests whether exposure to fentanyl could cause a positive test. The administrator said "it couldn't be ruled out. If it was potentially a one positive testing result that could have been somehow on someone's hands or particles were done, and they touched their mouth." But the administrator said that exposure would not necessarily stay in a person's system for weeks at a time, and that "it was unlikely" multiple positive tests were due to exposure.

Wong also testified that father's spending time with mother in July 2025 raised concerns about the status of their relationship. She had questions in light of his contradictory statements and evasions, which included not only his statements about his contact with mother but also his assertion of sobriety in light of his positive test results.

Father also testified at the hearing. He said he had moved from his "Sober Living Environment" to a one-bedroom apartment in late June 2025, where he lived by himself. Mother did not live there, but in July 2025 she had stayed there with him on his days off, beginning on every Monday night and leaving on Wednesday morning. He said that, although mother had been arrested three times for drugs about a month and a half before she

7

stayed with him, she only told him about one arrest, "pinned it on someone else," and denied being charged. He believed her after overhearing her conversation with a "clerk," who said a decision about pressing charges against her had yet to be made.

Father testified that he had been involved with mother for 19 years and had lived with her for six to eight years before he went to prison, but that she had not lived with him since his release. He said he was "done" with their relationship because of mother's drug use, lifestyle, and the people with whom she associated, describing her as "an addict." Although she had told him she was not using, he had learned from his "exposures" (meaning his positive tests in July 2025) that she was using, so she was "not allowed to come over ever again." For his safety and Lilith's, he had accepted that she was "not to be in my life."

Father acknowledged that he had not been honest with Wong about spending time with mother because he was concerned "they would use that against me." He said that when he told Wong he had helped mother move some things out of storage, he withheld that he had also been intimate with her in July 2025. He also acknowledged he was supposed to stay away from people who were bad influences but had not stayed away from mother.

Father also said he had a "feeling" mother was using drugs during her pregnancy with Lilith, but he would only see her once a week and she would deny using.

Father further testified that he attended an outpatient drug program once a week as required by federal probation authorities and his reunification plan. He was halfway through the program with about 20 sessions left to attend. Also, he saw a therapist once a week although probation did not require him to do so. He was drug testing for probation

twice a week. At first, he denied missing tests, then said he had missed some because of his work as an auto and bike mechanic. He said he had the job since May 2023, worked five days and fifty hours a week, and that his work schedule was not flexible enough for him to test all the time, but that he was able to test a lot of times on his days off.

As for his July 2025 positive drug tests, father denied using and said the positive tests were due to his exposure to mother, with whom he had been intimate when she spent nights with him in July 2025. She had told him she was clean, did not use in front of him, and never used in his house because he did not allow her to do that, but he realized she had used because of his positive tests. He had informed his probation officer on July 30 about three of the tests but did not learn about the fourth until the day before the hearing. He had been taking a drug, suboxone, for eight years that reduced and eliminated his drug cravings, and he planned to continue taking it.

After the presentation of evidence, counsel for the Agency and for Lilith argued the juvenile court should adopt the Agency's recommendation to terminate father's reunification services. Lilith's counsel did not find father's explanation for his positive drug tests credible, noted his evasiveness with Wong, and was concerned that he had allowed mother to spend nights at his home when part of his relapse prevention was to stay away from people who could trigger his drug use. Counsel doubted he would have zero contact with mother going forward, which created a risk to Lilith. She did not think father showed the necessary behavioral changes to create confidence that he could be reunified with Lilith by the 12-month review.

Counsel for the Agency agreed, and noted the Agency had recommended an end to reunification services even before learning about

9

father's positive test results in July or the time he had spent with mother that month. Moreover, counsel argued, the 12-month review was scheduled to take place the next month, making it particularly doubtful father could be reunified with Lilith by that time.

Father's and mother's counsel argued for the extension of father's reunification services. Father's counsel asked the court to find father's explanations of his positive test results credible, pointed to father's progress and cooperation, and emphasized father's stated commitment to end his relationship with mother.

The court found clear and convincing evidence that father had failed to make substantive progress and that there was not a substantial probability that Lilith might be returned to him. The court said it did not find father credible. It thought "the one honest thing" he testified to was that he lied to Wong. The court also found him to be evasive and inconsistent at times in his testimony, such as when he first denied missing drug tests before admitting that he had missed some, his saying he had a feeling that mother was using, and his failure to report all four of his positive drug tests to probation. It did not think father had absorbed "that lesson completely"—a reference apparently to drug use—or he would never have had mother at his new apartment. The court terminated reunification services for both father and mother and scheduled a permanent plan selection and implementation hearing under section 366.26 for January 7, 2026.

The Agency requested that father's visitation rights with Lilith be reduced to every other week for six weeks and then once a month until the section 366.26 hearing, and Lilith's counsel supported "tapering down the visits." Father objected to a reduction in his visitation rights because, his

10

counsel contended, it would endanger his ability to argue he qualified for the beneficial parent/child relationship exception to the termination of his parental rights. The court was not persuaded his ability would be affected under the circumstances and ordered the reduction in visitations requested.

Father filed a timely notice of intent to file a writ petition.

## II. DISCUSSION

### A. *The Termination of Father's Reunification Services*

Father first argues the juvenile court erred by failing to extend his reunification services to the 12-month review because the Agency did not show by clear and convincing evidence that he had not made significant progress in resolving the problems that led to Lilith's removal.

#### 1. Legal Standards

For a parent of a child who was under three years old when initially removed from the parent's physical custody, "court-ordered services shall be provided for a period of 6 months from the dispositional hearing as provided in subdivision (e) of Section 366.21, but no longer than 12 months from the date the child entered foster care, as provided in Section 361.49, unless the child is returned to the home of the parent . . . ." (§ 361.5 subd. (a)(1)(B).) "If, at the six- or 12-month status review hearing, the court finds that there is a substantial probability the child may be returned to her parent within six months, . . . the court extends reunification services for an additional six months rather than proceed to the final stage of dependency proceedings, permanency planning. (. . . §§ 361.5, 366.21, subds. (e)(3) [for children under three] . . . )." (*Michael G. v. Superior Court* (2023) 14 Cal.5th 609, 625.)

For a parent of such a child, if, at the six-month review (but no later than 12 months after the date the child entered foster care, whichever occurs earlier), "the court finds by clear and convincing evidence that the

11

parent failed to participate regularly and make substantive progress in a court-ordered treatment plan, the court may schedule a hearing pursuant to Section 366.26 within 120 days.  If, however, the court finds there is a substantial probability that the child . . . may be returned to their parent . . . within 6 months . . . the court shall continue the case to the 12-month permanency hearing."  (§ 366.21, subd. (e)(1), (3); *In re Nolan W.* (2009) 45 Cal.4th 1217, 1235.)  Thus, " 'Section 366.21, subdivision (e), places discretion in the hands of the trial court as to whether to schedule a hearing to terminate parental rights.' "  (*F.K. v. Superior Court* (2024) 100 Cal.App.5th 928, 935.)

We consider a juvenile court's findings in support of an order terminating reunification services under a substantial evidence standard of review.  (*J.H. v. Superior Court* (2018) 20 Cal.App.5th 530, 535.)  "We resolve all conflicts in favor of the court's determinations, and indulge all legitimate inferences to uphold its findings."  (*Ibid*.)  To the extent a finding must be made by clear and convincing evidence, we " 'must determine whether the record, viewed as a whole, contains substantial evidence from which a reasonable trier of fact could have made the finding of high probability demanded by this standard of proof.' "  (*People v. Ramirez* (2022) 14 Cal.5th 176, 196.)

### 2. Analysis

Father argues the record shows he made significant progress in his court-ordered treatment plan.  He contends his visitation record with Lilith was "excellent"; that he "demonstrated the capacity and ability to both complete the objectives of his treatment plan and to provide for [Lilith's] safety, protection, physical and emotional well-being"; and that he "engaged fully in all of his court-ordered reunification services, including completing

12

the parenting class . . . , continuing with outpatient treatment, engaging in therapy or counselling, and remaining probation compliant."

Father also contends he "adequately addressed" the concerns about his relationship with mother. He cites his testimony that he was committed to keeping her out of his life. He contends that, given his testimony, the Agency's concern, shared by the court, that he had an ongoing relationship with mother was "conjecture" rather than "evidence," and "should not have been the basis to terminate [his] services in light of his full compliance with his case plan." He also contends "there was nothing of [his] conduct during the case that indicated he would not or could not abide by future court orders restricting Mother's access to the child should he move on to have unsupervised visits or placement."

As for his four positive drug tests in July 2025, father contends this was his "only misstep." He argues those positive tests were insufficient to support the court's conclusions that there was not a substantial probability of Lilith's return to him and that he had not made significant progress in treating the issues that led to her removal. According to father, "[i]t would've been more reasonable for the court to conclude future positive drug tests would be not too likely given [his] many months of clean tests, coupled with suboxone [that he testified he had long been taking to eliminate his drug cravings], and his track record of maintaining full-time work."

Father's arguments are unpersuasive for two reasons. First, father ignores that the juvenile court found his testimony was not credible.

"It is the trial court's role to assess the credibility of the various witnesses, to weigh the evidence to resolve the conflicts in the evidence. We have no power to judge the effect or value of the evidence, to weigh the evidence, to consider the credibility of witnesses or to resolve conflicts in the

13

evidence or the reasonable inferences which may be drawn from that evidence.  [Citations.]  Under the substantial evidence rule, we must accept the evidence most favorable to the order as true and discard the unfavorable evidence as not having sufficient verity to be accepted by the trier of fact." (*In re Casey D.* (1999) 70 Cal.App.4th 38, 52–53; see also *In re Kenneth D.* (2024) 16 Cal.5th 1087, 1102 ["It is ultimately within the purview of the juvenile court to make determinations of credibility . . . because it is uniquely positioned to reach these conclusions based on its familiarity with the case and those involved."].)

The juvenile court could reasonably find father was not credible in light of, for example, his admission that he had tried to deceive Agency supervisor Wong about the time he spent with mother in July 2025, his flip-flopping testimony about missing drug tests, his four positive drug tests shortly after he left his Sober Living Environment, and his insistence that those tests were solely due to exposure to mother even though the amounts of fentanyl and/or Norfentanyl found in his samples rose significantly each test and Wong testified that a lab administrator said repeated positive tests from an exposure were unlikely.  The court could also reasonably conclude from this substantial evidence that father *had* engaged in conduct that indicated he would not abide by future court orders prohibiting his use of substances and his allowing mother access to the child.

Second, additional substantial evidence supports the juvenile court's disbelief that father would end his relationship with mother.  It was a relationship of many years that father continued despite losing custody of a previous child, Orion, for virtually the same substance abuse by mother that led to this proceeding.  And despite his knowledge of mother's drug use during her pregnancy with Lilith that endangered Lilith at birth, Lilith's

14

removal because of that substance abuse, and the initiation of these proceedings, he continued the relationship. He began spending his "weekends" with mother as soon as he was able to—in July 2025, within a couple of weeks of his moving from his Sober Living Environment to his own apartment—even though he also knew that mother had been arrested for drug possession just a short time before, in May 2025. And even if the court had found credible his claims that he believed mother each time she said she was not using—and, again, the court reasonably concluded he was not credible—the court could reasonably conclude his poor judgment in believing mother's denials posed a substantial risk that he would allow her access to Lilith in the future and thereby continue to endanger Lilith's safety and well-being.

Thus, the court could reasonably find father, even more than a year after Lilith's removal and the Agency's providing of reunification services, while he may have made efforts and cooperated with the Agency, was continuing to abuse substances and spend significant time with mother even though she continued to abuse substances herself. The court could rely on these findings separately and together to find by clear and convincing evidence that father failed to make substantive progress in his court-ordered treatment plan, and that there was not a substantial probability that daughter might be returned to him by the 12-month review, especially given that it was scheduled to occur a short time after the six-month review hearing. Father's claim to the contrary is little more than a request that we reweigh the evidence in his favor, which we cannot do under a substantial evidence standard of review. It lacks merit.

## B. *The Reduction of Father's Visitation Rights with Lilith*

Father also argues that the juvenile court erred when, along with terminating his reunification services, it reduced his visitation rights with

15

Lilith from twice weekly to once every two weeks and then, after six weeks, to once a month until the section 366.26 hearing because it prejudicially impairs his ability to raise the beneficial parent/child relationship exception to the termination of his parental rights (see § 366.26, subd. (c)(1)(B)(i)).  He further contends "[t]here was no factual basis here to reduce Father's visits" or "evidence presented that the minor was not able to handle or adapt to the current schedule of visits. . . . The court did not articulate any factual findings that support its order.  The court's ordered [reductions] were reflexive, not supported by evidence or logic, and therefore were an abuse of discretion."

A juvenile court must continue to permit parental visitation with a child after terminating the parent's reunification services, but has broad discretion to reduce those visitation rights if it finds that visitation would be detrimental to the child.  (§ 366.21, subd. (h) [Upon scheduling a section 366.26 hearing, "[t]he court shall continue to permit the parent . . . to visit the child pending the hearing unless it finds that visitation would be detrimental to the child"]; *In re Stephanie M.* (1994) 7 Cal.4th 295, 317 ["After the termination of reunification services, the parents' interest in the care, custody and companionship of the child are no longer paramount."]; *In re Marilyn H.* (1993) 5 Cal.4th 295, 309 ["Once reunification services are ordered terminated, the focus shifts to the needs of the child for permanency and stability."].)

We shall not disturb the juvenile court's exercise of its discretion regarding a parent's visitation rights unless we are presented with clear reason to do so.  (See *In re P.L.* (2024) 100 Cal.App.5th 406, 410 ["juvenile court's broad discretion in fashioning visitation will not be disturbed on review absent a clear abuse of discretion"]; *In re S.H.* (2011)

16

197 Cal.App.4th 1542, 1557 ["dependency law affords the juvenile court great discretion in deciding issues relating to parent-child visitation, which discretion we will not disturb on appeal unless the juvenile court has exceeded the bounds of reason"].)

Moreover, we presume a juvenile court's orders are correct. (*In re J.F.* (2019) 39 Cal.App.5th 70, 79.) The appellant has the burden of affirmatively showing error. (*Ibid*.) Father does not meet this burden, referring only to the general law regarding the parent/child beneficial relationship exception and contending the juvenile court's order lacked logic or evidentiary support without further elaboration. He does not, for example, cite any law indicating a juvenile court errs by reducing post-reunification parental visitation rights because it might impair a parent's ability to argue against termination of parental rights, such as based on the parent/child beneficial relationship exception, or that a juvenile court is required to explain its decision to limit such visitation rights. Instead, he presumes such impairment will occur in his case and such an explanation by the court is necessary. We have no reason to agree with him in the absence of any citation to relevant legal authority, particularly in light of the juvenile court's broad discretion to determine a parent's visitation rights and the relatively short time between termination of father's reunification services—in this case September 2025—and the section 366.26 hearing—scheduled for January 7, 2026, making it unlikely the court's reduction of his visitation rights will materially impair his arguments against termination of his parental rights.

In light of father's failure to meet his burden as appellant, his visitation claim fails.

17

Also, given our conclusions, we see no reason to stay the January 7, 2026 section 366.26 hearing.

## III. DISPOSITION

Father's petition and request for a stay of the January 7, 2026 section 366.26 hearing are denied. Our decision is final as to this court immediately. (Cal. Rules of Court, rule 8.940(b)(2)(A).)

STREETER, Acting P. J.

WE CONCUR:

GOLDMAN, J.
MOORMAN, J.*

---

* Judge of the Mendocino Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.